1  B. Benedict Waters
   6230 Wilshire Boulevard, # 182
2  Los Angeles, CA 90048-5104
   310-967-3943
3



FILED
CLERK, U.S. DISTRICT COURT

MAY - 2 2011

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

4  Plaintiff, *Pro Se*

5

6  # United States District Court

7  # Central District of California

8

9

10  B. Benedict Waters,                    ) Case No. 10-CV-05296-~~DMG~~ (JCGx) (CAS)(AJWx)

11              *Plaintiff*,              )

12      vs.                                )       **Second Amended Complaint**

13                                         )       DEMAND FOR JURY TRIAL

14  Howard Sommers Towing, Inc.,           )

15  Hollywood Tow Service, Inc.,           )

16  LDC Collection Systems, Inc.,          )

17  Steve Thompson,                        )

18  John X,                                )

19  John Doe 1,                            )

20  John Doe 2,                            )

21  John Doe 3,                            )

22  Rita L. Robinson,                      )

23  City of Los Angeles,                   )

24  Ciro Ochoa,                            )

25  Steven Ramirez,                        )

26  Jerry Brown, in his official capacity, )

27  Kamala Harris, in her official capacity, )
    STATE OF CALIFORNIA,                   )
                    *Defendants*.          )
28

ORIGINAL

## Jurisdiction

1.     This court has original subject matter jurisdiction of the federal law claims under 15 U.S.C. § 1681p, 28 U.S.C. § 1331; and, has supplemental jurisdiction of the pendent state law claims under Fed.R.Civ.P. 18(a); 28 USC § 1367(a).

## Emotional Distress

2.     As used herein and throughout this Complaint, the term **emotional distress** encompasses but is not limited to severe, extreme and ongoing mental anguish, physical pain and anxiety including:

    a.     Sleeplessness;

    b.     Myokymia, including at times physical pain;

    c.     Periods of anxiety with accompanying shaking and/or heart palpitations;

    d.     Night sweats on an average of twice a week;

    e.     Dyspnea;

    f.     Feelings of rage and

    f.     Constant feelings of helplessness and powerlessness.

3.     Plaintiff suffered and continues to suffer, as an actual and proximate result of the continuing conduct herein complained of the above, emotional distress.

4.     In doing the things herein complained of, Defendants, and each of them, knowingly, consciously and deliberately engaged in atrocious, repeated, extreme and outrageous conduct well outside the bounds tolerated by a decent or civilized society including **but not restricted to** the following:

    a.     Ignored Plaintiff's repeated attempts to informally resolve some of the matters herein complained of.

    b.     Refused to obey state laws designed to protect people including Plaintiff.

    c.     Refused to obey federal laws and constitutional safeguards designed to protect people including Plaintiff.

5.      In doing the things herein complained of, Defendants showed a reckless and conscious disregard of the probability that their conduct would cause Plaintiff to suffer severe, extreme and ongoing emotional distress, mental anguish, physical pain and anxiety.

## Consciousness of Guilt

6.      *"It has always been understood -- the inference indeed is one of the simplest in human experience -- that a party's falsehood or other fraud in the preparation and presentation of his cause, his fabrication or suppression of evidence by* **bribery** *or spoliation, is receivable against him as an indication of his consciousness that his case is a weak or unfounded one; and from that consciousness may be inferred the fact itself of the cause's lack of truth and merit."* **McQueeney v. Wilmington Trust Co.** (3d Cir. 1985) 779 F.2d 916, 921 - 922 *quoting* 2 Wigmore § 278(2) (Chadbourne Rev. 1979).

7.      As used herein **"consciousness of guilt"** includes but is not limited to Defendants' bribery and corruption of a federal judicial officer - Christina A. Synder (**"Synder"**), falsehoods and other fraud, fabrication of evidence, suppression of evidence, perjury, subornation of perjury and filing false declarations in a federal proceeding.  In doing the things herein complained of Defendants have performed, displayed and employed acts constituting consciousness of guilt.

8.      By way of explication and not limitation in support of the above allegation of bribery, **Synder** in *B. Benedict Waters v. Juan Carlos Cases et al., 09-cv-07696 CAS (AJWx)*, stated that *"plaintiff presents the same evidence of conspiracy in this case as he did in the related case* [07-cv-07568 CAS (AJWx) . . . ."* and then ruled in favor of the defendants. **Plaintiff never presented any evidence** of conspiracy in "[07-cv-07568 CAS (AJWx)".  None.

9.      By way of explication and not limitation in support of the above allegation of bribery, **Synder** in *B. Benedict Waters v. Juan Carlos Cases et al., 09-cv-*

1    07696 CAS (AJWx), ruled that a debt arising from an involuntary tow **was not** a

2    transaction.  This ruling was entirely favorable to the defendants; Plaintiff's case

3    was dismissed.  About three months later, in *B. Benedict Waters v. Hollywood*

4    *Tow Service, Inc. et al.,* 07-cv-07568 CAS (AJWx) **Synder** ruled that a debt

5    arising from an involuntary tow **was** a transaction; *same defendants*.  This ruling

6    was entirely favorable to defendants; Plaintiff's case was dismissed.

7    10.     In **Pintos v. Pacific Creditors Ass'n** (9th Cir. 2010) 605 F. 3d 665

8    *previously* (565 F.3d 1106 (9th Cir. 2009) *initially* 504 F.3d 792 (9th Cir. 2007)

9    the Ninth Circuit Court of Appeals ruled that an involuntary tow was not a credit

10   transaction involving the vehicle's owner(s).

11   11.     By way of explication and not limitation in support of the above allegation

12   of bribery, **Synder** in *B. Benedict Waters v. Juan Carlos Cases et al.,* 09-cv-

13   07696 CAS (AJWx), ruled that the Defendant Experian Information Solutions, Inc.

14   ("Experian") could **continue** reporting involuntary tows of vehicles **as** defaulted

15   credit **transactions** involving the vehicle's owner(s).  **Synder**'s action was in

16   rejection of Ninth Circuit law.  This ruling was entirely favorable to the defendant

17   Experian (Experian had repeatedly lost on this issue, **Pintos**, *supra*, before the

18   United States Court of Appeals for the Ninth Circuit); Plaintiff's case was

19   dismissed.

20   12.     By way of explication and not limitation in support of the above allegation

21   of bribery, **Synder** in *B. Benedict Waters v. Juan Carlos Cases et al.,* 09-cv-

22   07696 CAS (AJWx), stated that "[I] **agree**() with Experian that plaintiff's alleged

23   'factual disputes' are in **fact** mischaracterized legal disputes [plural in the

24   original] regarding the rights of defendants to tow Waters' car, to levy a lien

25   based on Waters' non-payment of towing charges, to charge interest on that lien,

26   and to report the existence of the resulting debt, and disputes as to the correct

27   characterization of the legal relationships between the parties.  See Exhibit 1 to

28   Hardeman Declaration, Waters' deposition testimony, at 91, 92, 94, 95."

13.     Attached hereto, marked as **Exhibit "A"** and incorporated herein by this reference is a true copy the above "*Exhibit 1*" to "*Hardeman Declaration's*"

14.     **Synder** contended that within Plaintiff's deposition testimony (Pages "*91, 92, 94, 95*" - "*Exhibit 1 to Hardeman Declaration*") Plaintiff testified that his disputes were:

(1)     Defendants' (Experian Information Solutions, Inc., Rickenbacker Group, Inc., Juan Carlos Casas' and Hollywood Tow Service, Inc.'s) right to tow Plaintiff's car;

(2)     Defendants' (Experian Information Solutions, Inc., Rickenbacker Group, Inc., Juan Carlos Casas' and Hollywood Tow Service, Inc.'s) right to levy a lien based on Plaintiff's non-payment of towing charges;

(3)     Defendants' (Experian Information Solutions, Inc., Rickenbacker Group, Inc., Juan Carlos Casas' and Hollywood Tow Service, Inc.'s) right to charge interest on that lien;

(4)     Defendants' (Experian Information Solutions, Inc., Rickenbacker Group, Inc., Juan Carlos Casas' and Hollywood Tow Service, Inc.'s) right to report the existence of the resultant debt;

(5)     The legal relationships between the parties (Plaintiff and Experian Information Solutions, Inc., Rickenbacker Group, Inc., Juan Carlos Casas' and Hollywood Tow Service, Inc.'s).

15.     **There is no such testimony** in "*Exhibit 1 to Hardeman Declaration*". Nonetheless, based on this non-existent 'testimony' **Synder** dismissed Plaintiff's federal consumer credit lawsuits.  Twice.  These dismissals were, of course, quite entirely favorable to defendants.

16.     By way of explication and not limitation in support of the above allegation of bribery, **Synder** in *B. Benedict Waters v. Hollywood Tow Service, Inc. et al.,* 07-cv-07568 CAS (AJWx) contended that: "*The **TAC alleges** that Hollywood*

1  *Tow employees Montoya and John Doe 4 took plaintiff's keys* **out of the**

2  **ignition of his car as plaintiff was attempting to drive out of the garage**,

3  *and refused to relinquish them for about twenty minutes, causing plaintiff to*

4  *remain in the garage against his will while awaiting the return of his keys."*

5  17.    There is no such allegation in the Third Amended Complaint in *B. Benedict*

6  *Waters v. Hollywood Tow Service, Inc. et al., 07-cv-07568 CAS (AJWx).*

7  18.    It is **not** possible to remove the key from the ignition of a 1978 Camaro

8  while the car is being driven and the key in the "*on*" position.  With the key in the

9  "*on*" position the car's engine will run.   Were the key in the "*off*" position,

10  however, the car's engine could not have run and thus Plaintiff could not have

11  been "*attempting to drive out of the garage.*"  Were the key not in the "*on*"

12  position, the steering wheel would have locked and thus Plaintiff could not have

13  been "*attempting to drive out of the garage.*"

14  19.    At all times herein relevant, vehicular exit of cars impounded by Defendant

15  Hollywood Tow Service, Inc. is by a metal gate which is controlled (raised and

16  lowered) by a Hollywood Tow Service employee.  Were Plaintiff "*attempting to*

17  *drive out of the garage*" with his Camaro sans Hollywood Tow's consent that

18  Plaintiff could do so, he would have had to crash through the metal gate.

19  20.    **Synder** fabricated the above non-existent allegations of the instant Third

20  Amended Complaint then dismissed based on her own fictionalized version of the

21  pleadings in *B. Benedict Waters v. Hollywood Tow Service, Inc. et al., 07-cv-*

22  *07568 CAS (AJWx).*  **Synder 's** malfeasance in falsifying allegations and then

23  dismissing based on her own fallacies was obviously entirely favorable to

24  defendants.

25  21.    By way of explication and not limitation in support of the above allegation

26  of bribery, **Synder** created a non-existent version of California law, ruling in *B.*

27  *Benedict Waters v. Hollywood Tow Service, Inc. et al., 07-cv-07568 CAS*

28  *(AJWx)* that state law permitted Defendant Hollywood Tow to seize the car  keys

1  that Plaintiff already had in his possession when he walked into Hollywood Tow

2  **the day after** Hollywood Tow had involuntarily seized Plaintiff's car!

3  22.   **There is no such California law**; **Synder**  made this 'law' out of whole

4  cloth solely to aid Defendant Hollywood Tow Service, Inc. and its employee.

5  23.   By way of explication and not limitation in support of the above allegation

6  of bribery, Plaintiff undertook to count the number of case citations presented by

7  him in _B. Benedict Waters v. Juan Carlos Cases et al._, 09-cv-07696 CAS

8  (AJWx) and _B. Benedict Waters v. Hollywood Tow Service, Inc. et al._, 07-cv-

9  07568 CAS that **Synder** then ignored; reaching **231** cases Plaintiff stopped the

10  count.

11  24.   One of the cases most prominently ignored by **Synder**  in _B. Benedict_

12  _Waters v. Juan Carlos Cases et al._, 09-cv-07696 CAS (AJWx) was **_Gorman v._**

13  **_Wolpoff & Abramson_** (9th Cir. 2009) **584 F.3d 1147**; a case not coincidentally

14  confuting the defendants' proffered defense.

15  25.   Plaintiff was self-represented in the 2007 case and in the 2009 case,

16  conducted legal research, read the opposing briefs, arguments and cases cited by

17  the defense and **Synder** and concluded that he would not have fared any worse had

18  he been represented by an empty chair.

19  26.   By way of explication and not limitation in support of the above allegation

20  of bribery, **Synder**  frequently ignored defendants' felonious criminal acts of

21  perjury (Cal. Evid. C., § 118), suborning perjury  (Cal. Evid. C., § 127) and

22  submitting false declarations in a federal proceeding (18 U.S.C. § 1621(2)) so she

23  could vacate the default of Defendant Rita Robinson in _B. Benedict Waters v._

24  _Juan Carlos Cases et al._, 09-cv-07696 CAS (AJWx).

25  27.   Robinson submitted a declaration under oath and penalty of perjury wherein

26  she **admitted** that she had been served at her office on 2010 February 17 with

27  summons re _B. Benedict Waters v. Hollywood Tow Service, Inc. et al._, 07-cv-

28  07568 CAS.

1   28.   Robinson was served by Al Edwards (a registered process server).

2   29.   In the **same** declaration, however, without bothering to check to see who

3   had served her in the above 2007 case, Robinson then denied ever being served at

4   her office on 2010 February 17 with summons re *B. Benedict Waters v. Juan*

5   *Carlos Cases et al.*, 09-cv-07696 CAS (AJWx).

6         A.    Rita L. Robinson claimed that Al Edwards had **never ever**

7               been to her office on 2010 February 17.

8   30.   When Plaintiff pointed out the obvious incongruity and violation of the laws

9   of nature re Rita L. Robinson's sworn statements – that Edwards **had been** to

10  Robinson's office on February 17th to serve her with the **2007** case but at the same

11  time **had never been** to her office on February 17th and thus could not have served

12  Robinson with the **2009** case  –  Robinson solved her dilemma by simply changing

13  her story; in yet another document Rita L. Robiinson now denies she had been

14  served with the **2007** case after all.

15  31.   Hard to believe?  Not with a little practice.  As the White Queen says to

16  Alice: "*When I was your age, I always did it for half-an-hour a day.  Why,*

17  *sometimes I've believed as many as six impossible things before breakfast*".

18

19                          **Judicial Estoppel**

20  32.   Defendant City is barred by the Doctrine of Judicial Estoppel from asserting

21  as a defense or adopting the position that said Defendant is not subject to and

22  liable for compensatory damages as a consequence of Defendant's *per se* violation

23  of a federal constitutional right.

24  33.   "*The federal doctrine of judicial estoppel precludes a party from*

25  *asserting a position in a judicial proceeding which is inconsistent with a*

26  *position previously successfully asserted by it in a prior proceeding. 'Thus,*

27  *the 'essential function and justification of judicial estoppel is to prevent the*

28  *use of intentional self-contradiction as a means of obtaining unfair*

1  *advantage in a forum provided for suitors seeking justice.* [Citation.]'

2  [Citation.] *The primary purpose of the doctrine is not to protect the litigants,*

3  *but to protect the integrity of the judiciary.* [Citations.] *The doctrine does not*

4  *require reliance or prejudice before a party may invoke it.*" **Southmark v.**

5  **Trotter, Smith & Jacobs** (1994) 212 Ga.App. 454, 442 S.E.2d 265, 266-267.

6

7  ## Facts Common Across Causes of Action

8  34.   The matters herein complained of began, as to Plaintiff, on the late evening

9  near midnight of 2006 October 21.

10  35.   Plaintiff was ticketed and his vehicle impounded on 2006 October 21, a

11  **Saturday**, for parking "*1 foot*" behind a traffic control sign that Defendant City's

12  meter maid, Antonia Mendieta of its Department of Transportation, **alleged**

13  prohibited parking on **Saturday**.

14  36.   Plaintiff has insisted very publicly since 2006 October 21 that the sign only

15  prohibited parking on **Tuesday**.

16  37.   It has never been disputed that Defendant City and its Department of

17  Transportation are in possession of a photograph of the said sign, the photograph

18  having been taken on that 2006 October 21, at the time, and that said photograph

19  ("**Photograph**") shows only __one__ traffic control sign, prohibiting parking on

20  **Tuesday**.

21  38.   It has never been disputed that Defendant City and its Department of

22  Transportation hid and continues to hide and suppress the **Photograph**.

23  39.   On 2006 October 21, at the spot where Plaintiff parked, there was only a

24  sign prohibiting parking on **Tuesday**.

25  40.   Plaintiff parked on **Saturday** and was ticketed by Defendant City's meter

26  maid, Antonia Mendieta of the Los Angeles Department of Transportation on **that**

27  **Saturday** for allegedly parking under a purported temporary "*No Parking*" **sign**

28  that supposedly temporarily prohibited parking on **that particular Saturday** .

41.    At the time of the ticket and impound, Defendant City, through its employee Antonio Mendieta of its Transportation Department, took a photograph of the **sign** at issue; the photograph revealed only a sign prohibiting **Tuesday** parking.

42.    Subsequently, Plaintiff requested of Defendant City, Rita L. Robinson and its Department of Transportation, under California's Public Records Act, Government Code, § 6250 et seq., an exact copy of the **Photograph**.  Defendant City and its Department of Transportation refused to provide an exact copy of the **Photograph**.

43.    Defendant City and its Department of Transportation then *suppressed* the **Photograph**, in violation, in no particular order, of California's constitution, California's Public Records Act and Defendant City's own regulation to boot.

44.    Plaintiff, of course, given the above facts, disputed the 2006 October 21 ticket and disputed the legality of the impound of his Camaro.

45.    An administrative hearing was held to resolve the dispute.

46.    At the administrative hearing conducted by Defendant City, the ticketing meter maid, Antonia Mendieta, was caught in false testimony (**perjury**), the street address where Plaintiff's vehicle was allegedly parked at the time of the ticket was proved not to exist (*by Defendant City's own municipal records*), there was no evidence presented that any "*temporary*" No Parking signs had been authorized at the spot where Plaintiff had parked his car and the **Photograph** showed only the image of the permanent sign prohibiting parking on Tuesday.

47.    A person may only be ticketed – well, lawfully – for being in violation of an *authorized* sign.

48.    Disregarding all of the above, Defendant City and its Transportation Department found the parking ticket valid.

49.    Plaintiff applied to the California Superior Court for a *de novo* hearing. The California Superior Court ordered Defendant City and its Transportation Department to transfer the *entire* administrative file to it; including the **Photograph**.

50.     Defendant City and its Transportation Department disobeyed the Superior Court's above Order.

51.     Defendant City and its Transportation Department did **not** send the **entire** file as ordered.

52.     Defendant City and its Transportation Department first **removed** the **Photograph** showing Plaintiff's vehicle parked on **Saturday** under a sign barring parking on **Tuesday**.

53.     Had Defendant City and its Transportation Department left the **Photograph** in the file, obeyed the Order and sent the entire file including the **Photograph** over to the Superior Court the **Photograph** would have become a Superior Court document, a **public** record, and thus admissible in evidence.

54.     The Superior Court reversed the 2006 October 21 parking ticket, ordered Plaintiff's parking fine returned and Plaintiff's Superior Court filing fee refunded by Defendant City.

55.     During this ordeal, Plaintiff wrote letters of protest to the mayor and city council of Los Angeles, to the management of the Los Angeles Department of Transportation, to the Los Angeles Times and various community and activist organizations complaining about the corrupt parking ticket system of the city of Los Angeles as well as the management and corruption of Los Angeles Department of Transportation.

56.     Pursuant to the above parking ticket, Plaintiff's Camaro (Vehicle No. 2) was seized and impounded on 2006 October 21.  Plaintiff retrieved it from impound about five days later at a cost of several hundred dollars.

57.     Subsequent to retrieval of Plaintiff's vehicle and following the beginning of Plaintiff's above complaints - Plaintiff was subject to threats of violence against Plaintiff's person and health if Plaintiff continued efforts to obtain access to public records and/or sought to vindicate his federal rights in court.

///

58.    On or about 2007 July 15, at 201 North Los Angeles Street, Los Angeles, California, Donetta Beckum, an employee of Defendant City and its Transportation Department, told Plaintiff that said Transportation Department would retaliate against Plaintiff if Plaintiff persisted in trying to obtain a copy of the **Photograph**.

59.    Plaintiff sued in federal court in November 2007, among other things for an exact copy of the **Photograph**.

60.    Shortly thereafter, Plaintiff was subjected to harassment and retaliation.

61.    It became so persistent that Plaintiff began documenting the harassment and retaliation which was initially directed solely against Vehicle No. 2 – his Camaro. Plaintiff took photographs.

62.    At no time herein relevant, did Plaintiff park his vehicles in the same spot continuously for more than 72 hours.

63.    Plaintiff had been parking his vehicles in the 900 block of North Citrus Avenue for several months and had occasion on more than one occasion to observed parked a gray Ford F150 pickup truck, California license plate number 7E67191, that was nearly always parked in the same spot at 937 North Citrus Avenue in the city of Los Angeles; said vehicle in hereinafter referred to simply as the pickup truck.

64.    Plaintiff had been parking his vehicles in the 900 block of North Citrus Avenue for several months and had occasion on more than one occasion to observed parked a white Chevrolet 3500 Van, California license plate number 7S85795, that was nearly always parked in same spot, a yellow Loading Only Zone curb area near 937 North Citrus Avenue in the city of Los Angeles; said vehicle in hereinafter referred to simply as the van.

65.    On 2008 March 19, Plaintiff parked his Camaro (Vehicle No. 2) next to 937 North Citrus Avenue in the city of Los Angeles.

/ / /

66.     A parking ticket against the Camaro was issued the **same** day, on 2008 March 19, by Defendant City and an employee of its Transportation Department, for allegedly being parked more than 72 hours in the same spot; one tire was marked with white chalk.  Plaintiff removed the white chalk mark.

67.     At that time, 2008 March 19, Plaintiff observed that the pickup truck and the van were each still parked in their usual spots; the van was still parked in the yellow Loading Only Zone curb area.  Plaintiff inspected both vehicles; neither had been ticketed or its tires marked.

68.     On 2008 March 20, Plaintiff's Camaro  was parked next to 940 North Citrus Avenue.

69.     Plaintiff's Camaro  was ticketed by Defendant City and an employee of its Transportation Department, for allegedly having been parked more than 72 hours in the same spot; driver's side **front** tire was marked with white chalk.  Later the same day, 2008 March 20, the driver's side **rear** tire was marked with white chalk. The van and pickup truck were each still parked in their usual spots; the van was still parked in the yellow Loading Only Zone curb area same as the day before. Plaintiff inspected both vehicles; neither had been ticketed or its tires marked.

70.     On 2008 March 20, there was a large commercial generator on an automotive-size dolly parked on the street, in the 900 block of North Citrus Avenue, immediately behind Plaintiff's Camaro.

71.     At all times herein relevant, it is a violation of Defendant City's ordinance and/or regulation to park a commercial generator on a city street absent a permit.

72.     Plaintiff inspected it; neither had it been ticketed or its tires marked.

73.     From 2008 March 23 through 2008 April 02, the van and pickup truck each remained parked in their usual spots; the van still parked in the yellow Loading Only Zone curb area same as the day before.  Plaintiff inspected both vehicles; neither were ever ticketed or tires marked during this period.  During this period, Plaintiff regularly operated his Camaro and then parked it behind the van.

74.     On 2008 April 02, Plaintiff's Camaro was parked behind the van when it was again ticketed, by Defendant City and an employee of its Transportation Department, for allegedly being parked in the same spot more than 72 hours.  At no time between March 23 through 2008 April 02 had Vehicle No. 2's tires been marked.  Plaintiff made a note to walk off the distance between the van and his Camaro.

75.     On 2008 April 02, there were two massive generator on automotive-size dollies, parked on the wrong side of the 900 block of North Citrus Avenue, parked in a yellow Loading Only Zone.

76.     On 2008 April 03, Plaintiff walked off the distance between the rear of the van and the front of his Camaro at approximately 60 feet.

77.     Plaintiff took written note of another massive generators on automotive-size dollies, parked on the wrong side of the 900 block of North Citrus Avenue.

78.     Both generators were parked in a yellow Loading Only Zone.  Plaintiff inspected both; neither had been ticketed or tires marked.

79.     On 2008 April 04, Plaintiff made written note of the fact the pickup truck had remained in one spot for so long the driver's side rear tire was deflating.

80.     On 2008 April 05, Plaintiff photographed the pickup truck's deflating tire.

81.     On 2008 April 05, a large commercial generator was still parked on the street, the 900 block of North Citrus Avenue, in a yellow Loading Only Zone, on the wrong side of Citrus Avenue.  Another truck was also parked in yellow Loading Only Zone hitched to another commercial generator.

82.     On 2008 April 05, Plaintiff inspected both the generator and the truck; neither had been ticketed or tires marked.

83.     On 2008 April 05, for the first time, Vehicle No. 2 had its tire marked (front driver's side with white chalk and the street pavement adjacent to the tire mark was also marked with white chalk.

84.     On 2008 April 08, the rear tire of the pickup truck was partially re-inflated

SECOND AMENDED COMPLAINT                                              **Page 14**

1    and the pickup truck moved forward entirely into a yellow Loading Only Zone

2    next to 937 Citrus Avenue. The van had been moved forward, immediately behind

3    pickup truck and was now partially parked in the same yellow Loading Only Zone.

4    85.    On 2008 April 08, the generator had been moved and parked on the correct

5    side of Citrus Avenue but was now parked in a red No Parking Zone curb space.

6    Plaintiff inspected all (pickup truck, van, generator); none had been ticketed or

7    tires marked.

8    86.    On 2008 April 10, Plaintiff more closely examined rear tire of pickup truck;

9    took photograph. Tire nearly 100% deflated. Pickup truck remained parked in

10    yellow Loading Only Zone curb area. Plaintiff inspected; no ticket or tire marked.

11    87.    On 2008 April 10, two massive generators on automotive-style dollies were

12    parked in street of 900 block of North Citrus Avenue; one of which generators was

13    parked in red No Parking Zone curb space; both photographed. Plaintiff inspected

14    both; neither had been ticketed or tires marked.

15    88.    On 2008 April 10, Plaintiff's Camaro was ticketed, by Defendant City and

16    an employee of its Transportation Department, for allegedly being parked in the

17    same spot for more than 72 hours.

18    89.    On 2008 April 13, Plaintiff photographed the pickup truck parked in the

19    same yellow Loading Zone Only curb space described in Paragraph 86. Plaintiff

20    inspected it; neither had it been ticketed or its tires marked.

21    90.    On 2008 April 13, Plaintiff photographed a graffiti-covered vehicle where it

22    had been habitually parked for several months on Romaine Street across from the

23    towing garage of Defendant Hollywood Tow Service, Inc.

24    91.    At all times herein relevant, the pickup truck and van were parked within

25    100 feet of Plaintiff's vehicles.

26    92.    The above harassment and retaliation of Plaintiff's vehicles being issued

27    sham ticketed allegedly for being parked more than 72 hours in the same spot on

28    Citrus Avenue while vehicles actually parked more than 72 hours in the same

1  spots on Citrus Avenue were ignored continued until approximately mid-June
2  2008 and suddenly stopped.

3  93.    However, Plaintiff remained vigilant, checking the tires of his vehicles for
4  chalk marks, and moving or operating his vehicles within 72 hours at all times
5  herein relevant up to and including 2008 July 17.

6  94.    Plaintiff first applied for a California driver's license in June of 1966.

7  95.    Prior to taking the California driver examination in 1966, Plaintiff
8  familiarized himself with the provisions of California's then Vehicle Code.

9  96.    Prior to taking the state driver examination in 1966, Plaintiff enrolled in and
10  satisfactorily completed a private course in driving, which private course included
11  the safe operation of a vehicle.  This private-school course included parallel-
12  parking.  Plaintiff scored 100% on the written portion of the driving school's tests
13  and scored excellent on the driving skills and parking skills portion of the driving
14  school's tests.

15  97.    As a consequence, Plaintiff became knowledgeable and proficient in
16  parking.

17  98.    Subsequently, after passing the private driving school's course, Plaintiff
18  applied to the California Department of Motor Vehicles for a  driver's license.

19  99.    At that time, in June 1966, Plaintiff duly took and passed the written portion
20  of the California Department of Motor Vehicles' driver's examination.  At that
21  time, Plaintiff duly took and passed the eyesight examination portion of the
22  California Department of Motor Vehicles' driver's examination.

23  100.  At that time, Plaintiff took and duly passed the official California test for
24  driving skills by operating a motor vehicle (after Plaintiff's vehicle passed a safety
25  inspection) under the direction and observation of a person holding himself out as
26  an employee of the California Department of Motor Vehicles regularly employed
27  for the purpose of assessing driving skills, knowledge of driving conditions and
28  recognition of road signs controlling moving and parking traffic.

101.   At that time, Plaintiff successfully passed the above driving and parking portions of the California Department of Motor Vehicles driving examination. Part of this 1966 test for driving skills included testing Plaintiff's parallel-parking skills and knowledge of law pertaining to parking, *i.e.*, maximum permissible distance from the curb of those wheels of the vehicle closest to the curb.

102.   Plaintiff successfully and competently passed all portions of the California Department of Motor Vehicles' driving test, did not miss a single question, no errors on the eye exam, and one deduction for driving (rolling "California" stop).

103.   Plaintiff was issued a Class "C" driver's license.

104.   Subsequently, Plaintiff acquired the skill and the means of operating a motorcycle and has owned several over the years.  Plaintiff developed, became and is proficient in driving and parking motorcycles.  Motorcycles can be parked in a manner creating a public nuisance or safety hazard.  As a consequence, Plaintiff's special awareness of parking safely and properly was enhanced.

105.   Subsequently, Plaintiff acquired the skill and knowledge in the operation and driving of forklifts (propane, gasoline), front-wheel propulsion, rear-wheel turning and was a certified forklift operator.  Forklifts can definitely be parked in a manner creating a safety hazard.

106.   As a consequence, Plaintiff's special awareness of parking safely and properly was further enhanced.

107.   Over the years, Plaintiff's vision, including peripheral vision and night vision, has been checked both for occupational purposes and as a volunteer in an eyesight research project at the University of California, Los Angeles.

108.   Plaintiff's vision has always tested 20/20 with above-average peripheral vision, and above-average night vision.  At all times herein relevant, Plaintiff's vision was 20/20 with above-average peripheral vision and night vision.

///

109.   Subsequent to obtaining his driver's license in 1966, and at all times

1  thereafter, Plaintiff has continued operation of motor vehicles including parking.

2  110.  On Thursday, 2008 July 16, Plaintiff performed his above routine, custom

3  and practice of parking Vehicle No. 1 and Vehicle No. 2 in the 900 block of North

4  Citrus Avenue.

5  111.  Plaintiff parallel-parked Vehicle No. 1 (CA license plate 2EUA051) at or

6  near 940 North Citrus Avenue, in the City and County of Los Angeles, California,

7  and parallel-parked Vehicle No. 2 (CA license plate 058UBV) in a line behind

8  Vehicle No. 1.

9  112.  At the time that Plaintiff parallel-parked his vehicles at or near 940 North

10  Citrus Avenue, on 2008 July 16, visibility was unobstructed, dry weather

11  conditions, and clear sky.  Plaintiff, having had the opportunity to observe same,

12  having operated a motor vehicle at the time, would estimate linear visibility at 5

13  miles.

14  113.  On 2008 July 16, Plaintiff, as a consequence of the harassment above-

15  described, exited his vehicles and deliberately inspected and verified that his right

16  (passenger-side) front wheel was approximately 3 inches from the curb as to

17  Vehicle No. 1 and Vehicle No. 2.   Plaintiff deliberately inspected and verified by

18  visual inspection that his right (passenger-side) rear wheel was approximately 3

19  inches from the curb as to Vehicle No. 1 and Vehicle No. 2.

20  114.  At the time that Plaintiff parked his vehicles at or near 940 North Citrus

21  Avenue, Plaintiff as a consequence of the harassment above-described, parked his

22  vehicles with more than his usual attention to and concern for legal parking and

23  parking safety; more than the attention and concern Plaintiff had acquired since

24  before June of 1966 and followed and practiced ever since after June of 1966.

25  115.  Subsequent to June of 1966, Plaintiff has never received a parking ticket for

26  parking in an unsafe or hazardous manner.

27  ///

28  116.  On 2008 July 17 neither Vehicle No. 1 or Vehicle No. 2 was parked in an

1  unsafe and hazardous manner.

2  117.   At the time that Plaintiff parked Vehicle No. 1 and Vehicle No. 2 at or near

3  940 North Citrus Avenue, on 2008 April 16, Plaintiff parked in the same manner

4  that he had been parking said vehicles for several months at or near 940 North

5  Citrus Avenue.

6  118.   At the time that Plaintiff parked Vehicle No. 1 and Vehicle No. 2 at or near

7  940 North Citrus Avenue, on 2008 April 16, Vehicle No. 1 and Vehicle No. 2 had

8  **not** been parked in their respective spots for more than 72 hours.  On 2008 July 15,

9  neither Vehicle No. 1 and Vehicle No. 2 was parked at or near 940 North Citrus

10  Avenue, Los Angeles, California.

11  119.   On 2008 April 16, as was Plaintiff's custom, fully aware of the type of

12  traffic using and traveling on 900 block of North Citrus Avenue, Plaintiff stood on

13  the sidewalk adjacent to where Plaintiff had parked Vehicle No. 1 and Vehicle No.

14  2 and observed the flow of traffic.  Plaintiff observed that the flow of traffic was

15  and continued to move past Vehicle No. 1 and Vehicle No. 2 without slowing

16  down, changing speed or linear direction.  Traffic did not swerve or alter its course

17  in any way.  Plaintiff had an ample, leisurely opportunity to observe and did

18  observe that the traffic driving pass Vehicle No. 1 and Vehicle No. 2 did not

19  modify their rate of movement or direction in any way.  It was a clear day.

20  120.   On 2008 July 17, Plaintiff having had the opportunity and experience of

21  operating and parking motor vehicles since 1966, and exercising that opportunity

22  and experience did witness and observe that neither Vehicle No. 1 or Vehicle No.

23  2 were impeding or interfering with traffic, impeding or interfering with the public

24  or otherwise causing or creating any exigent circumstance.

25  121.   On 2008 July 17, Plaintiff having had the opportunity and experience, and

26  exercising that opportunity and experience did witness and observe that neither

27  Vehicle No. 1 or Vehicle No. 2 were causing or creating a need for the exercise of

28  any governmental authority or police power.

122.   On 2008 July 17, Plaintiff having had the opportunity and experience, and exercising that opportunity and experience with extra caution due to the above harassment did witness and observe that Vehicle No. 1 and Vehicle No. 2 were lawfully parked; neither vehicles tires were marked.

123.   On 2008 July 17, John Doe 1, while working as a meter maid and with the authority issued him by Defendant City of Los Angeles and its Transporation Department deliberately and knowingly requested that Defendant Howard Sommers Towing and Defendant Hollywood Tow Service come to the 900 block of North Citrus Avenue and participate in the seizure of Vehicle No. 1 and of Vehicle No. 2 on the deliberately and knowingly false pretext that said Vehicles had been parked at 940 North Citrus Avenue continuously in excess of 72 hours.

124.   On 2008 July 17, in response to John Doe 1's above request, Defendant Howard Sommers Towing and Defendant Hollywood Tow Service knowingly and willfully dispatched  tow trucks operated by Steve Thompson and John Doe 2 respectively to the 900 block of North Citrus Avenue and each said Defendant knowingly and willfully did participate in the seizure of Vehicle No. 1 and of Vehicle No. 2.

125.   On 2008 July 17, Defendants John Doe 1, John Doe 2, and Steve Thompson had the opportunity to observe that Vehicle No. 1 and Vehicle No. 2 were each lawfully parked and said Defendants did so observe Vehicle No. 1 and Vehicle No. 2 to be lawfully parked.

126.   Based on all of the foregoing, Defendants lacked any lawful reason or probable cause to seize Vehicle No. 1 or Vehicle No. 2 on 2008 July 17.

127.   On or about 2008 July 24, Plaintiff received a <u>Vehicle Impound Notice</u> through the ordinary course of the mail informing Plaintiff that a post-deprivation hearing as to Vehicle No. 1 could be requested within ten days of said notice.  Said notice informed that a post-deprivation hearing could be requested by mail.

128.   On or about 2008 July 24, Plaintiff received a <u>Vehicle Impound Notice</u>

through the ordinary course of the mail informing Plaintiff that a post-deprivation hearing as to Vehicle No. 2 could be requested within ten days of said notice.  Said notice informed that a post-deprivation hearing could be requested by mail.

129.   Rita L. Robinson was appointed General Manager of the Transportation Department of Defendant City in 2007 and in that capacity a had final policy-making authority, and directed the *"day-to-day operations"* of the approximately 2,000 employees of the Transportation Department.

130.   At all times herein relevant, Rita L. Robinson acted under her authority as the General Manager of the Transportation Department of Defendant City.

131.   On 2008 July 28, pursuant to California's Public Records Act, California Government Code, § 6250 et seq., Plaintiff requested Rita L. Robinson produce **exact** copies of the impound log, all writings referenced by or relating to the impound log, as well as any writing pertaining to any complaints vis-a-vis Vehicle No. 2 along with a copy of the policies, guidelines and procedures for impounding a vehicle of the Transportation Department of Defendant City .

132.   Under California's Public Records Act, Defendant Robinson was required to give a response to Plaintiff's request.

133.   Robinson ignored California's Public Records Act.

134.   Robinson ignored Plaintiff's above request as well..

135.   Within the ten-day period of the above <u>Vehicle Impound Notice</u> re Vehicle No. 1, Plaintiff sent through the ordinary course of the United States mail a written request for a post-deprivation hearing as to Vehicle No. 1.

136.   Within the ten-day period of the above <u>Vehicle Impound Notice</u> re Vehicle No. 2, Plaintiff sent through the ordinary course of the United States mail a written request for a post-deprivation hearing as to Vehicle No. 2.

137.   Plaintiff waited approximately two weeks after making the above requests; not having received a post-deprivation hearing date Plaintiff sent a written inquiry to Rita L. Robinson of Defendant City's Transportation Department.  Plaintiff did

1  not receive the courtesy of a response.

2  138.   Plaintiff waited about an additional two weeks; not having received a post-

3  deprivation hearing date Plaintiff then sent a follow-up written inquiry to Rita L.

4  Robinson of Defendant City's Transportation Department.  Plaintiff did not

5  receive the courtesy of a response.

6  139.   On or about 2008 August 11, not having received any hearing date, Plaintiff

7  telephoned Defendant City's Department of Transportation, spoke to possible

8  Operator 25 or possibly 77 who otherwise refused to provide her name or any

9  other identifier but who verified that each of the above post-deprivation hearing

10  requests had been received by Defendant City's Transportation Department.

11  140.   On 2008 August 14, Plaintiff wrote Defendant Hollywood Tow Service, Inc.

12  direct demanding the return of Vehicle No. 2.  Plaintiff did not receive the

13  courtesy of a response.

14  141.   Plaintiff waited approximately ten more days; not having received a post-

15  deprivation hearing date Plaintiff then sent a letter to Rita L. Robinson informing

16  that his requests for post-deprivation hearings had been received by her

17  department but that no hearing date had been received by Plaintiff.  Plaintiff did

18  not receive the courtesy of a response.

19  142.   On 2008 September 13, Plaintiff was informed that Vehicle No. 2 had been

20  sold at action by Defendant Hollywood Tow Service, Inc.  Plaintiff was extremely

21  outraged and emotionally distressed by this information.

22  143.   On 2008 September 14, Plaintiff wrote a strongly-worded letter to Rita L.

23  Robinson demanding an explanation as to why no post-deprivation hearings had

24  been scheduled as to Vehicle No. 1 and Vehicle No. 2.  Plaintiff did not receive

25  the courtesy of a response.

26  144.   On or about 2010 February 17, Plaintiff telephoned Defendant City's

27  Department of Transportation and employing a ruse managed to speak with

28  Defendant Rita L. Robinson.

145.   Once Robinson was reached, Plaintiff identified himself and was immediately recognized by Robinson by his name.  Plaintiff inquired if Robinson had received Plaintiff's letters complaining of harassment, of the 2008 July 17 impound of Vehicle No. 1 and Vehicle No. 2, and of the lack of a hearing date re the 2008 July 17 impound of Vehicle No. 1 and Vehicle No. 2.  Robinson responded in the affirmative.

146.   Plaintiff inquired if Defendant Robinson had received his Public Records Act request for information pertaining to the July 17th impounds and her department's procedures for impounding vehicles.  Robinson again responded in the affirmative.

147.   Plaintiff then inquired why nothing had been done other than to sell his prized Camaro.

148.   Vehicle No. 2 was, at all times herein relevant, a limited production Camaro and while not a classic car was a collectible car in that it was more than thirty years of age and a limited production model.

149.   Robinson responded that Plaintiff had been warned.  Robinson stated that she had ordered Vehicle No. 1 and Vehicle No. 2 impounded solely in retaliation for Plaintiff's prior complaints to and about her department and as a consequence of Plaintiff having sued the city of Los Angeles and her personally in federal court.  Robinson also stated that she had directed that no hearing be held as to the impound of Vehicle No. 1 and as to the impound of Vehicle No. 2 and so none would be held.

150.   No post-deprivation hearing was ever scheduled as to Vehicle No. 1 or as to Vehicle No. 2.

151.   Defendant Robinson stated that she had no intention of responding to Plaintiff's Public Records Act requests either.

///

152.   Based on the foregoing, Rita L. Robinson's decision to have Vehicle No. 1

1  and Vehicle No. 2 impounded solely in retaliation for Plaintiff's prior complaints

2  to and about her department and as a consequence of Plaintiff having sued the city

3  of Los Angeles and her personally in federal court was the direct and proximate

4  cause of Vehicle No. 1 and Vehicle No. 2 being impounded on 2008 July 17.

5  153.   Based on the foregoing, Rita L. Robinson's decision that a post-deprivation

6  hearing not be held as to the impound of Vehicle No. 1 or Vehicle No. 2 was the

7  direct and proximate cause of no post-deprivation hearing ever being held.

8  154.   At all times herein relevant, 940 North Citrus Avenue was and is within the

9  jurisdiction of the Los Angeles Police Department's West Bureau.  Within the said

10  West Bureau, traffic-related matters are handled by the West Traffic Division.

11  155.   Defendant Ochoa's traffic stop of Plaintiff also occurred in the West Traffic

12  Division.

13  156.   In 2006, command of the West Traffic Division was handed over to Capt.

14  Nancy Lauer.  LAPD  Captain Lauer and her sergeants and lieutenants then made

15  it clear to LAPD officers that they were expected to write at least 18 tickets **each**

16  day.

17  157.   The number of tickets an officer wrote was recorded on their performance

18  evaluation, according to Howard Chan and David Benioff, both veteran

19  motorcycle officers with the West Traffic Division, who sued the Los Angeles

20  Police Department in 2009, alleging that they had been **punished** with bogus

21  performance reviews, threats of reassignment and other forms of **harassment** after

22  objecting to demands from commanding officers that they write a certain number

23  of tickets each day.

24  158.   Police officers Chan and Benioff said that supervisors ranked them against

25  other officers **based on** the number of **tickets** they wrote and cars they

26  **impounded**, which is also a violation of California law.

27  / / /

28  159.   Parking ticket quotas and vehicle impound quotas are illegal under

1   California law, since such quotas can pressure police to write spurious tickets and
2   unlawfully impound cars to meet the goal.
3   160.   In the City of Bell, California, police officers themselves and others
4   **admitted** to targeting and impounding vehicles on account of the race of the
5   driver.
6   161.   Plaintiff's attaches a Los Angeles Times newspaper article, *United States v.*
7   *Hatfield, 2008 U.S. Dist. LEXIS 77842*, Federal Rule of Evidence 902(6), detailing
8   that "[o]*fficers in [City of Bell a] poor, largely immigrant community were*
9   *pushed to have more cars towed and, at one point, were given what some*
10   *patrol officers said amounted to a daily quota.*" *Id.*, **Ex. "B"** at 1.  The Times
11   quoted police Sgt. Art Jimenez as admitting, "*Rather than being police officers*
12   *and being proactive looking for crime, we were out there looking for vehicles*
13   *to impound.*" *Id.*, **Ex. "B"** at 2.  The Times also reported that Bell police officer
14   Kurt Owens filed state and federal lawsuits in 2009 as a consequence for being
15   "*punished for refusing to go along with a department-mandated quota for*
16   *impounds, tickets and arrests.*"
17   162.   On 2007 July 15, Antonia Mendieta, then and now an employee of
18   Defendant City's Department of Transportation, employed as a meter maid,
19   admitted that Defendant's Transportation Department had a parking ticket and
20   impound quota.
21   163.   Antonia Mendieta admitted in November of 2009 to impounding Vehicle
22   No. 2 on 2006 October 21 just to meet his impound quota.
23   164.   On 2007 July 15, Donetta Beckum, then an employee of Defendant City's
24   Transportation Department, employed as a hearing examiner re disputed parking
25   tickets and disputed vehicular impounds, admitted that Defendant's Transportation
26   Department had a parking ticket and impound quota.
27   / / /
28   165.   Defendant City now claims it ended ticket and impound quotas in 2009.

SECOND AMENDED COMPLAINT                                    **Page 25**

166.   Defendant City's de facto policy of quotas in its West Traffic Division and its Transportation Department was the direct and proximate cause of Plaintiff's Vehicles Nos. 1, 2, and 3 being impounded under color of state authority in violation of the Fourth Amendment and Fourteenth Amendment in that Defendant City's employees felt pressured to meet their quotas under pain of retaliation, punishment and discharge.

167.   On 2009 May 20, Jimmy Price, <u>Chief of Parking Enforcement</u>, of Defendant City's Transportation Department, flat out stated that Defendant City's Transportation Department employees "***never***" issue a parking ticket in error.  Never.

168.   On or about 2011 April 26, two meter maids of Defendant City's Transportation Department were suspended after they starred alongside a blonde actress in a porn film - while they were on duty.

169.   In the explicit video, the two unnamed male Transportation Department employees - both in uniform - are seen spanking and fondling a naked woman in broad daylight on a Los Angeles city street.

170.   Defendant City's Transportation Department  management, including Jimmy Price, knew about two unnamed male Transportation Department employees above on duty porn activity **months** ago, but failed to discipline them.

171.   The two unnamed male Transportation Department employees X-rated antics came to public light after an investigation by NBC4 Los Angeles, which received a copy of the video.

172.   When NBC4 asked why he had not disciplined the two men, Jimmy Price replied he had only seen some stills from the video, and was not 'able to positively identify the individuals as employees.

173.   However, the prospective airing of the story on NBC apparently had a miraculous effect on Jimmy's eyesight for he was then not only able to identify the wayward traffic officers but suspend them as well.

174.   The two unnamed male Transportation Department employees were

1  suspended – with full pay.

2  175.   Plaintiff is informed and believes and thereon alleges that Defendant City

3  does not discipline its employees for issuing parking tickets without probable

4  cause or for causing the impound of vehicles without probable cause.

5  176.   Defendant City's *laissez-faire* policy of holding its meter maids as "*never*"

6  being wrong was a direct and proximate cause of John Doe 1 seizing Vehicle No.

7  1 and Vehicle No. 2 on 2008 July 17 without any probable cause for doing so.

8  John Doe 1 acted in the manner as herein complained directly because of and with

9  the knowledge that he would not be subject to any discipline or adverse action due

10  to the "*never*" wrong *de facto* policy of Defendant City.

11  177.   Defendant City has for years maintained a defective mail system as to its

12  Transportation Department.

13  178.   Defendant City has received numerous complaints from people over the

14  years that its Transportation Department's mail system does not accurately or

15  adequately track mail received.

16  179.   At all times herein relevant, Defendant City was aware of hundreds and

17  thousands of instances over the past ten years where parking ticket disputes mailed

18  to it were simply lost in its Transportation Department's inadequate mail system

19  and otherwise not accounted for.

20  180.   At all times herein relevant, Defendant City was aware of hundreds and

21  thousands of instance over the past ten years where impound disputes and requests

22  for hearings mailed to its Transportation Department were simply lost in its

23  Transportation Department's inadequate mail system and otherwise not accounted

24  for, logged or tracked.

25  181.   At all times herein relevant, Defendant City was aware that solely as a

26  consequence of its Transportation Department's own inadequate mail system

27  people would suffer the lost of opportunity for a timely post-deprivation hearing

28  where the request was sent to its Transportation Department by mail.

182.   Notwithstanding the above, Defendant City was totally indifferent to the need to improve its Transportation Department's inadequate mail system, did not improve its Transportation Department's mail system,  and its Transportation Department's inadequate mail system was the direct and proximate cause of Plaintiff's timely request for a post-deprivation hearing as to Vehicle No. 1 and timely request for post-deprivation hearing as to Vehicle No. 2 to be lost, not logged or tracked in its Transportation Department's inadequate mail system.

## First Claim for Relief

**Claim for Relief Against Defendants City of Los Angeles and LDC Collection Systems, Inc. For Sending A Dunning Letter In Violation Of The Fair Debt Collections Practices Act**

183.   Plaintiff repeats and re-alleges and incorporates by reference the allegations in Paragraphs 1 thru 182, inclusive, above, with the same force and effect as if each herein fully and entirely set forth.

**(NOTE:  The First Claim for Relief, First Amended Complaint (for sending a dunning letter following a failed prepayment agreement) was dismissed with prejudice on or about 2011 April 11. [Order, Doc. 77].  Accordingly, at this time DEFENDANT CITY  need not respond to Plaintiff's Claim for a FDCPA violation.)**

184.   Defendant City of Los Angeles and LDC Collection Systems, Inc. Are each a debt collector within the meaning of the FDCPA.  Defendant City and LDC Collection Systems, Inc. acting in concert mailed Plaintiff several **dozen** letters threatening various things.

185.   Defendants demanded various payments.

186.   But, Plaintiff was unemployed and remained unemployed.

/ / /

187.   Defendants continued to bombard Plaintiff with threatening collection

1   letters.

2   188.   Plaintiff wearied of the constant threats, offered to pay within 3 months.

3   187.   The offer was accepted.

4   188.   **The dunning letters stopped immediately**.  But, Plaintiff was unable to

5   pay within the agreed three months.

6   189.   As a consequence of the missed agreed-upon payment, Plaintiff received

7   from Defendants City of Los Angeles and LDC Collection Systems the subject

8   matter collection letter and a return envelope bearing both Defendants' names but

9   using Defendant City's Postal Box address.

10   190.   Defendants' letter contains three misrepresentations:

11   191.   **Misrepresentation #1**.  The letter represented that "*We notified you*

12   *previously that your ability to obtain credit is in jeopardy*."

13   192.   **Misrepresentation #2**.  The letter continued with a separate representation

14   that, "*This is a serious situation, which can have an adverse effect on your*

15   *ability to secure credit for consumer loans, **mortgages**, credit cards, and*

16   *rental or lease agreements*."

17   193.   **Misrepresentation #3**.   And the representation that "*We strongly urge*

18   *you to protect your credit rating by sending full payment upon receipt of this*

19   *letter*."

20   194.   Defendants' letter violated 15 USC § 1692e, subdivision 10.

21   195.   Failing to pay off a repayment plan regarding a parking ticket does not

22   jeopardize one's ability to obtain credit as the prepayment plan transaction was

23   never reported to a consumer credit reporting agency.

24   196.   Defendants had no intention of reporting the matter to a consumer credit

25   reporting agency ("CRA").  Defendants never did report the matter to a CRA.

26   197.   Failing to pay off a repayment plan regarding a parking ticket does not have

27   *an adverse effect on* [Plaintiff's] *ability to secure credit for consumer loans, ,*

28   ***mortgages**, credit cards, and rental or lease agreements*."

198.   Paying off a repayment plan regarding a parking ticket would not *"protect"* Plaintiff's credit rating.

199.   The <u>First Claim for Relief</u> is created by, arises under and is pursuant to the <u>Fair Debt Collection Practices Act</u> ("FDCPA") generally, codified at 15 U.S.C. § 1692 *et seq*. and specifically 15 U.S.C. §§ 1692e(2)(A); 1692e(10); 1692k(a)(1); 1692k(a)(2)(A); and 1692k(a)(3).

200.   At all times herein relevant, the subject matter Defendants were and are a *"debt collector"* as defined by 15 U.S.C. § 1692a(6) of the FDCPA.

201.   At all times herein relevant, Plaintiff was and is a *"consumer"* as defined by Title 15, United States Code § 1692a(3) of the FDCPA.

202.   Based on the foregoing, Defendants violated the Fair Debt Collections Practices Act, 15 U.S.C. § 1692e(2)(a) and 1692e(10) and caused Plaintiff to suffer **emotional distress**.

203.   Defendants are each liable to Plaintiff for statutory damages of $1,000, actual damages in the amount of $250,000 and, as to LDC punitive damages in the amount of $500,000, plus court costs and reasonable attorney fees.

## <u>Second Claim for Relief</u>

**Claim for Relief Against Defendants City of Los Angeles, Rita Robinson, Howard Sommers Towing, Inc., and Steve Thompson for Seizing Vehicle No. 1 Without Warrant Or Probable Cause In Violation of the Fourth Amendment to the United States Constitution**

204.   Plaintiff repeats and re-alleges and incorporates by reference the allegations in Paragraphs 1 thru 203, inclusive, above, with the same force and effect as if each herein fully and entirely set forth.

205.   This Claim asserts a trespass of the community caretaker doctrine and violation of the Fourth Amendment's prohibition against unreasonable seizure by state actors. The Fourth Amendment is applicable to the states and state actors via

1    the Due Process Clause of the Fourteenth Amendment.

2    206.   Under the law of the circuit, **Miranda v. City of Cornelius** (9th Cir. 2006)

3    *429 F.3d 858*, a trespass of the community caretaker doctrine by state actors is

4    actionable under 42 U.S.C. § 1983. Violation of the Fourth Amendment's

5    prohibition against unreasonable seizure by state actors is cognizable under 42

6    U.S.C. § 1983.   At all times herein relevant, Defendants were acting under color

7    of state law including but not limited to California Vehicle Code, section 22651.

8    207.   Under circuit law, a *"person 'subjects' another to the deprivation of a*

9    *constitutional right, within the meaning of section 1983, if he does an*

10    *affirmative act, participates in another's affirmative act, or omits to perform*

11    *an act which he is legally required to do that causes the deprivation of which*

12    *the complaint is made."* **Hydrick v. Hunter** (9th Cir. 2007) *500 F.3d 978, 988*

13    quoting **Johnson v. Duffy** (9th Cir. 1978) *588 F.2d 740, 743.*

14    208.   Under circuit law, Defendant Hollywood Tow Service is liable as its policy

15    caused Doe 3 to seize Plaintiff's property.   *"Moreover, personal participation is*

16    *not the only predicate for section 1983 liability.  Anyone who 'causes' any*

17    *citizen to be subjected to a constitutional deprivation is also liable.  The*

18    *requisite causal connection can be established not only by some kind of*

19    *direct personal participation in the deprivation, but also by setting in motion*

20    *a series of acts by other s which the actor knows or reasonably should know*

21    *would cause others to inflict the constitutional injury.* [Citation.]" *Id.,* at 988

22    quoting **Johnson**, *supra, 588 F.2d at 743-744.*

23    209.   At all times herein relevant, Defendant City was and is a municipal

24    corporation of the state of California.

25    210.   In doing the things herein complained of, Defendant City acted under the

26    color of authority granted it by the state of California as a municipal corporation.

27    211.   In doing the things herein complained of, Defendant City, pursuant to its

28    above policies, Defendant Rita Robinson, pursuant to her final decision-making

1  authority as General Manager of Defendant City's Department of Transportation,
2  and Defendants Howard Sommers Towing, Inc. and Steve Thompson in
3  participation with Defendant City seized — without warrant, without probable
4  cause, without any threat of or actually impeding traffic, without any need for
5  community convenience or public safety — Vehicle No. 1 thereby violating
6  Plaintiff's right against such seizure as secured to him by the Fourth Amendment
7  to the United States Constitution.

8  212.   Defendant City's policies herein-above described caused the remaining
9  defendants conduct herein complained of.  Defendant City is therefore separately
10 liable to Plaintiff for compensatory damages.

11 213.   In doing the things herein complained of, Defendants' actions were
12 criminal, willful, malicious, demonstrated reckless indifference to the
13 constitutional rights of Plaintiff, were oppressive, of the kind and to the degree not
14 tolerated in civilized society, causing Plaintiff to suffer emotional distress,
15 financial and monetary loss.

16 214.   Accordingly, each said Defendant is separately liable to Plaintiff, under 42
17 U.S.C. § 1983, for compensatory damages in the amount of $1,000,000 dollars.

18 215.   Accordingly, Defendants Rita Robinson, Howard Sommers Towing, Inc.
19 and Steve Thompson are each separately liable to Plaintiff, under 42 U.S.C. §
20 1983, for punitive damages in the amount of $5,000,000 dollars.

21
22                              **Third Claim for Relief**
23 **Claim for Relief Against Defendant City of Los Angeles And Defendant Rita**
24 **Robinson In That In Refusing To Hold A Post-deprivation Hearing As To**
25 **Vehicle No. 1 Defendants Denied Plaintiff Due Process In Violation Of The**
26 **Fourteenth Amendment To The Constitution**

27 216.   Plaintiff repeats and re-alleges and incorporates by reference the allegations
28 in Paragraphs 1 thru 215, inclusive, above, with the same force and effect as if

1  each herein fully and entirely set forth.

2  216.   At all times herein relevant, Defendant City was and is a municipal

3  corporation of the state of California.

4  217.   In doing the things herein complained of, Defendant City acted under the

5  color of authority granted it by the state of California as a municipal corporation.

6  218.   In doing the things herein complained of, Defendant City, pursuant to its

7  above policies, and Defendant Rita Robinson, pursuant to her final decision-

8  making authority as General Manager of Defendant City's Department of

9  Transportation, willfully, knowingly and intentionally refused and failed to

10  provide Plaintiff a post-deprivation hearing following the seizure of Vehicle No. 1

11  thereby violating Plaintiff's right to due process secured to him by the Due

12  Process Clause of the Fourteenth Amendment to the United States Constitution.

13  219.   In doing the things herein complained of, Defendants' actions were willful,

14  malicious, demonstrated reckless indifference to the constitutional rights of

15  Plaintiff, were oppressive, of the kind and to the degree not tolerated in civilized

16  society, causing Plaintiff to suffer emotional distress, financial and monetary loss.

17  220.   Accordingly, each said Defendant is separately liable to Plaintiff, under 42

18  U.S.C. § 1983, for compensatory damages in the amount of $1,000,000 dollars.

19  221.   Accordingly, Defendant Rita Robinson is separately liable to Plaintiff,

20  under 42 U.S.C. § 1983, for punitive damages in the amount of $5,000,000 dollars.

21

22  ## **Fourth Claim for Relief**

23  **Claim for Relief Against Defendants City of Los Angeles, Rita L. Robinson,**

24  **John Doe 1, Hollywood Towing Service, Inc., and John Doe 2 for Seizing**

25  **Plaintiff's Property in Violation of the Fourth Amendment to the**

26  **Constitution**

27  / / /

28  222.   Plaintiff repeats and re-alleges and incorporates by reference the allegations

1  in Paragraphs 1 thru 221, inclusive, above, with the same force and effect as if

2  each herein fully and entirely set forth.

3  **(NOTE:  The Fourth Claim for Relief, First Amended Complaint (for seizing**

4  **Vehicle No. 2 without warrant or probable cause) was dismissed with**

5  **prejudice on or about 2011 April 11. [Order, Doc. 77].  Accordingly, at this**

6  **time Defendants City, John Doe 1, John Doe 2, and Hollywood Tow need not**

7  **respond to Plaintiff's Claim for Relief re their instant constitutional**

8  **violation.)**

9

10                    **Fifth Claim for Relief**

11  **Claim for Relief Against Defendant City of Los Angeles and Rita L.**

12  **Robinson for Denying Plaintiff Due Process in Violation of the Fourteenth**

13  **Amendment to the Constitution**

14  223.   Plaintiff repeats and re-alleges and incorporates by reference the allegations

15  in Paragraphs 1 thru 222, inclusive, above, with the same force and effect as if

16  each herein fully and entirely set forth.

17  **(NOTE:  The Fifth Claim for Relief, First Amended Complaint (for refusing**

18  **on or about 2010 February 17 to hold a post-deprivation hearing as to Vehicle**

19  **No. 2) was dismissed with prejudice on or about 2011 April 11. [Order, Doc.**

20  **77].  Accordingly, at this time Defendant City need not respond to Plaintiff's**

21  **Claim for Relief re their instant constitutional violation.)**

22

23                    **Sixth Claim for Relief**

24  **Claim for Relief Against Defendant Howard Summers Towing for Detinue,**

25  **Trespass to Chattel and Wrongful Detention**

26  224.   Plaintiff repeats and re-alleges and incorporates by reference the allegations

27  in Paragraphs 1 thru 223, inclusive, above, with the same force and effect as if

28  each herein fully and entirely set forth.

225.   On 2008 July 17, at all times herein relevant, Plaintiff's vehicle, California license plate number 2EUA051 (Vehicle No. 1) was lawfully parked at 940 North Citrus Avenue, in the city of Los Angeles, California.

226.   California law, Vehicle Code § 22850, requires involuntarily towed vehicles be taken to the "*nearest garage.*"

227.   On 2008 July 17, at all times herein relevant, the nearest garage for involuntary towed vehicles was located at Hollywood Tow Service, Inc., 1015 North Mansfield Avenue, Los Angeles, California.

228.   On 2008 July 17, at all times herein relevant, Defendants, and each of them, knew and/or were aware that the nearest garage to 940 North Citrus Avenue for vehicles involuntary towed at the request of Defendant City was located at Hollywood Tow Service, Inc., 1015 North Mansfield Avenue, Los Angeles, California.

229.   On 2008 July 17 - 1015 North Mansfield Avenue was approximately **four** city **blocks** (approximately 1,200 feet) from 940 North Citrus Avenue where Vehicle No. 1 was parked.

230.   On 2008 July 17 - Defendant Howard Sommers Tow, Inc. intentionally towed Vehicle No. 1 - without Plaintiff's consent - to 7252 Deering Avenue, Los Angeles, California.

231.   At all times herein relevant, 7252 Deering Avenue was and is approximately 19.88 **miles** direct distance or approximately 24.75 **miles** driving distance from 940 North Citrus Avenue.

232.   At all times herein relevant, Defendant Howard Sommers Tow, Inc. knew 7252 Deering Avenue, for vehicles involuntary towed at the request of Defendant City, was not the nearest garage to 940 North Citrus Avenue.

233.   On 2008 July 17, there was no public transportation whereby a person could travel from 940 North Citrus Avenue to 7252 Deering Avenue.

234.   On 2008 July 17, by the time Plaintiff determined that Vehicle 1 had been

1    towed to 7252 Deering Avenue that location had closed for business that day.

2    235.   On the evening of 2008 July 17, Plaintiff was in need of his prescription

3    medication located in Vehicle No. 1.

4    236.   As a proximate result of Defendant not transporting Vehicle No. 1 to the

5    nearest garage for vehicles involuntary towed at the request of Defendant City,

6    Plaintiff was deprived of his prescription medication and thus suffered resultant

7    pain, discomfort, mental anguish, shortness of breath and loss of sleep.

8    237.   On 2008 July 18, Plaintiff presented to Defendant Howard Sommers

9    Towing, Inc. for the purpose of retrieving Vehicle No. 1.

10   238.   On 2008 April 05, Jay Towing had, at Plaintiff's request, towed Plaintiff's

11   vehicle from 719 No. Edgemont to 6040 West Santa Monica Blvd., a distance

12   much greater than four blocks and a distance closer to two miles for the sum of

13   Forty ($40.00) Dollars.

14   239.   On 2008 July 18, Defendant adamantly refused to release and relinquish

15   possession of Vehicle No. 1 unless and until Plaintiff paid the exorbitant,

16   unnecessary, excessiv and unconscionable sum of **Six-Hundred Four** ($604.50)

17   Dollars for Vehicle No. 1 being involuntary towed the previous day; 2008 July 17.

18   240.   A person could then fly from Los Angeles to New York city and back again

19   – twice – for $600 dollars.

20   241.   Plaintiff paid the $604.50 plus other charges as otherwise an **additional**

21   daily charge would have accrued.

22   242.   Based on the foregoing, Defendant Howard Sommers Towing, Inc. is liable

23   to Plaintiff for detinue, trespass to chattel and detention in an amount to be

24   determined at time of trial but not less than $6,045 dollars in compensatory

25   damages.

26   243.   In towing Vehicle No. 1 past the nearest garage, and in towing Vehicle No.

27   1 approximately 25 miles in lieu of 4 blocks, Defendant's actions were willful,

28   malicious, demonstrated reckless indifference to the statutory rights of Plaintiff,

1  oppressive and of the kind and to the degree not tolerated in civilized society.

2  Accordingly, said Defendant is separately liable to Plaintiff for punitive damages

3  in the amount of $60,000 dollars.

4

## Seventh Claim for Relief

**Claim for Relief Against Defendant Hollywood Tow Service, Rita L. Robinson, City of Los Angeles and John Doe 1 For Retaliation As A Consequence Of Plaintiff's Exercise Of His The First Amendment Right To Seek Redress of Grievances**

10  244.   Plaintiff repeats and re-alleges and incorporates by reference the allegations

11  in Paragraphs 1 thru 243, inclusive, above, with the same force and effect as if

12  each herein fully and entirely set forth.

13  **(NOTE:  The Seventh Claim for Relief, First Amended Complaint, was**

14  **dismissed with prejudice on or about 2011 April 11. [Order, Doc. 75].**

15  **Accordingly, at this time Defendants Hollywood Tow, City and John Doe 1**

16  **need not respond to Plaintiff's Claim for Relief re their subject matter**

17  **constitutional violation.)**

18  245.   In doing the things herein complained of, said Defendants acted under color

19  of state authority and in retaliation for Plaintiff having previously sought redress

20  in state and federal court, for having complained to state and municipal authorities

21  regarding Defendant City and Defendant City's Transportation Department, and

22  for exercising Plaintiff's state rights to access to public records.

## Eighth Claim for Relief

**Claim for Relief Against Defendant Ochoa For Selective Enforcement Of Law By Seizing Plaintiff's Property On Account Of Race And Quota**

26  246.   Plaintiff repeats and re-alleges and incorporates by reference the allegations

27  in Paragraphs 1 thru 245, inclusive, above, with the same force and effect as if

28  each herein fully and entirely set forth.

247.   On 2008 November 24, Defendant Ochoa, then a sworn employee of the Los Angeles Police Department, Serial No. 35656, at all times relevant a *"peace officer,"* as defined in California Penal Code § 830.1 and acting in that capacity and under such authority, made a traffic stop of the vehicle being driven by Plaintiff.  Plaintiff is African American.  Defendant Ochoa is something else.

248.   **Ochoa gave as the reason for the stop that Plaintiff's vehicle (Vehicle No. 3) had a broken brake light lens, passenger side.**

249.   Ochoa issued Plaintiff a ticket for the broken brake light, citing California Vehicle Code § 24252(a), and for expired registration.

250.   Plaintiff disputed the ticket in the California Superior Court. **[RJN 5]** The matter was tried to the bench on 2009 September 10, the Honorable Stephen M. Moloney, judge presiding.

251.   Ochoa testified that he had stopped Plaintiff because he had observed a cracked brake light lens cover, through which he could observe the brake light bulb emit white light.

252.   Ochoa testified that Plaintiff had shown him the DMV printout and that this printout listed the need to repair the broken taillight lens before registration could be completed.

253.   Plaintiff zeroed in on that falsehood, pointing out *vociferously* that DMV counter clerks do not come out and inspect a vehicle.

254.   Ochoa then attempted to deny his own statements.

255.   Amazingly, Ochoa insisted, while still under oath, that he did not just say that Plaintiff had shown him the DMV printout **or** that this alleged printout listed the need to repair the broken taillight lens.

256.   Plaintiff bore in on that prevarication.   Plaintiff presented to Judge Moloney that once the trier of fact finds a witness has been untruthful about one thing it may disregard all of the witness' testimony.

257.   Judge Moloney responded testily that he was aware of that.

258. Judge Moloney then dismissed the purported violation of California Vehicle Code, § 24252(a).

259. There was no appeal. Ochoa is precluded from denying that the purported brake light violation was a pretext for the traffic stop.

260. At all times herein relevant, Ochoa had discretion under state law to cause or not to cause Plaintiff's vehicle to be impounded.

261. During the course of the traffic stop and related false arrest with excessive force, Defendant Ochoa exhibited racial animus, including the following:

    a.    Plaintiff had opportunity to see and observe Ochoa's facial expressions. Ochoa's facial expressions were hostile.

    b.    Plaintiff had opportunity to view Ochoa and perceive Ochoa's apparent age. At all times herein relevant, Plaintiff perceived Ochoa to be many years younger than Plaintiff. Nonetheless, during the course of the traffic stop and subsequent arrest, Ochoa referred to Plaintiff as "boy".

    c.    Plaintiff has been operating a motor vehicle for over 30 years in the city of Los Angeles, and has been stopped over 50 times by officers of the Los Angeles Police Department either for no manifested reason or for a minor equipment failure such as a burned out license plate bulb as a pretext and as a consequence of Plaintiff's race. Here, Ochoa used the pretext of a burned out brake light for the instant traffic stop.

    d.    Ochoa conducted an unlawful pat-down search of Plaintiff when it was readily and visibly apparent Plaintiff was not carrying any weapon. In conducting what the LAPD refers to as a pat-down search, Ochoa hit Plaintiff with unnecessary force.

    e.    Ochoa conducted an unlawful intrusive search of Plaintiff's garments

1  when it was readily and visibly apparent Plaintiff was not carrying

2  any weapon.  In conducting this search, Ochoa threatened Plaintiff

3  with physical harm in a racist manner (*"you'll feel like Rodney*

4  *King"*) if any sharp objects were encountered in Plaintiff's pockets.

5  f.  There were no safety equipment failures on Plaintiff's vehicle

6  (headlights, taillights, brake lights, windshield wipers, turn signals,

7  brakes - all worked and tires in good condition;

8  g.  The vehicle registration due the state of California had been fully

9  paid;

10  h.  Plaintiff had full coverage automobile insurance with the Automobile

11  Club of Southern California (AAA);

12  i.  The Los Angeles Police Department and its member officers, of

13  which at all times herein relevant Ochoa was a full-time member

14  officer, had then a history of racial profiling;

15  j.  Defendant Ochoa exhibited unnecessary hostile body language over

16  the course of the subject matter traffic stop (hands on hips, asking

17  questions with expectation of immediate answers, hostile stares);

18  k.  Used excessive force in arresting Plaintiff;

19  l.  Plaintiff explained that he was unemployed and would be unable to

20  recover his vehicle if it were impounded;

21  m.  Ochoa seized Plaintiff's key knowing the seizure agitated Plaintiff;

22  n.  Ochoa refused to return Plaintiff's key albeit knowing he was legally

23  required to do so upon Plaintiff's demand.

24  262.  The totality of the circumstances set out above establish Ochoa's action in

25  impounding Plaintiff's vehicle was based on race.

26  ///

27  ///

28  263.  The totality of the circumstances set out above establish Ochoa's action in

1   impounding Plaintiff's vehicle in the West Traffic Division was to meet his daily

2   quota of impounds.

3   264.   Solely on account of Plaintiff's race, Ochoa selectively exercised his

4   discretion and selectively enforced the law, causing Plaintiff's vehicle to be towed

5   and impounded by Hollywood Tow Service, Inc.

6   265.   In doing the things herein complained of, Defendant Ochoa, acting under

7   color of state authority, violated Plaintiff's right under the Equal Protection Clause

8   of the Fourteenth Amendment against selective enforcement of law based on race.

9   **Whren v. United States (1996) 517 U.S. 806.**

10   266.   In doing the things herein complained of Ochoa caused Plaintiff to suffer

11   emotional distress and loss of his vehicle.  violated 18 U.S.C. § 1981.  Based on

12   the foregoing, Ochoa is liable to Plaintiff pursuant to 42 U.S.C. § 1983 for

13   compensatory in the amount of $1,000,000 each.

14   267.   The conduct of said Defendant was willful, malicious, demonstrated

15   reckless indifference to the constitutional rights of Plaintiff, oppressive and of the

16   kind and to the degree not tolerated in civilized society.  Accordingly, each said

17   Defendant is separately liable to Plaintiff for punitive damages in the amount of

18   $5,000,000 dollars.

19

20   ## Ninth Claim for Relief

21   **Claim for Relief Against Defendants Ochoa, Hollywood Tow Service, Inc.**

22   **And John Doe 3 for Seizing Plaintiff's Property in Violation of the Fourth**

23   **Amendment to the Constitution**

24   268.   Plaintiff repeats and re-alleges and incorporates by reference the allegations

25   in Paragraphs 1 thru 267, inclusive, above, with the same force and effect as if

26   each herein fully and entirely set forth.

27   ///

28   269.   On 2008 November 24, Defendant Ochoa, then a sworn employee of the

1  Los Angeles Police Department, Serial No. 35656, at all times relevant a *"peace*
2  *officer,"* as defined in California Penal Code § 830.1 and acting in that capacity
3  and under such authority, made a traffic stop of the vehicle being driven by
4  Plaintiff.

5  270.   Ochoa gave as the reason for the stop that Plaintiff's vehicle had a broken
6  brake light lens, passenger side.

7  271.   At all times herein relevant, Ochoa was motivated by discriminatory intent
8  and racial animus.

9  272.   Ochoa caused the seizure of Plaintiff's vehicle by Defendant Hollywood
10 Tow Service, Inc.

11 273.   Ochoa caused Hollywood Tow Service to be summoned.

12 274.   Prior to any tow truck from Hollywood Tow Service having arrived, Ochoa
13 removed the ignition key from Plaintiff's key chain.

14 275.   Plaintiff, observing this act objected that Ochoa had no basis to seize
15 Plaintiff's key.

16 276.   Ochoa replied *"So".*

17 277.   Plaintiff's rejoinder was to the point - anything attached to the car was
18 subject to seizure – anything **not** attached to the car was **not** subject to seizure per
19 California law.

20 278.   Ochoa admitted he knew the applicable state law.

21 279.   California law provides that a possessory lien does **not** attach **until** the
22 vehicle is in the process of being towed.  California Vehicle Code, § 22851(a)(1);
23 see also Witkin, Summary of California Law (10th ed.) *Towing and Storage Lien,*
24 § 242, p. 265; *"The lien arises when the vehicle is removed and is in transit or*
25 *when vehicle recovery operations or load salvage operations begin. (C.C.*
26 *3028.1(a))"*

27 ///.

28 280.   California law provides that chattel **not attached** to the vehicle being seized

1  is not subject to seizure.  California Vehicle Code, § 22851(b).

2  281.  California law expressly provides that: **No lien shall attach to any**

3  **personal property in or on the vehicle.**  *Id.*  See also Witkin, Summary of

4  California Law (10th ed.) *Personal Property*, § 241, p. 263.

5  282.  California law expressly provides that any non-attached property in the

6  vehicle being seized must be handed over to the vehicle's owner upon demand if

7  demand was made during normal business hours.

8  283.  At all times herein relevant, Plaintiff was the vehicle's owner.  The matters

9  herein complained of occurred during normal business hours.  California Vehicle

10  Code, § 22851(b).

11  284.  Plaintiff persisted, demanding return of his ignition key.  Ochoa was legally

12  required to return the key per California Vehicle Code, § 22851(b) but refused to

13  do so.

14  285.  Ochoa then instructed Plaintiff not to argue with him.

15  286.  Plaintiff made no further comment.

16  287.  When a tow truck arrived, bearing Defendant Hollywood Tow Service's

17  logo and operated by Defendant John Doe 3; Ochoa handed Doe 3 Plaintiff's

18  property - the subject matter key.

19  288.  At that time, Plaintiff informed Doe 3 that the key had been seized by

20  Ochoa without Plaintiff's consent or any lawful reason.

21  289.  Plaintiff demanded Doe 3 return his ignition key.  Doe 3 was legally

22  required to return Plaintiff's key, California Vehicle Code, § 22851(b), but refused

23  to do so.

24  290.  Doe 3 voluntarily accepted the key from Ochoa and deliberately refused to

25  return it to Plaintiff upon Plaintiff's demand.  At all times hereafter relevant, Doe

26  3 maintained possession of Plaintiff's key.

27  / / /

28  291.  Doe 3 represented that he was following *"company policy"* which was

1  always to "*get and keep*" the key if it was available, that when Plaintiff recovered

2  his vehicle the key would be returned at that time.

3  292.   Plaintiff is informed and believes, and on that basis alleges, that it is the

4  policy of Defendant Hollywood Tow Service, Inc., to seize and caused to be

5  seized by its employees, whenever possible, the ignition and/or access keys of

6  vehicles involuntarily towed and/or impounded by Hollywood Tow Service.

7  293.   Doe 3 indicated that it was his plan and practice, pursuant to the above

8  policy of Defendant Hollywood Tow Service, Inc., to seize the key from a vehicle

9  being impounded whenever the key was then available.

10  294.   Ochoa was armed.  Ochoa's partner was armed.

11  295.   Doe 3 did not appear to be armed but his presence made the odds 3 to 1.

12  296.   Plaintiff did not attempt to forcibly retrieve his property – the key.

13  297.   In seizing Plaintiff's key, Defendants Ochoa and Doe 3 willfully acted

14  under color of state authority without warrant or probable cause in violation of

15  Plaintiff's Fourth Amendment right.

16  298.   Under circuit law, a "*person 'subjects' another to the deprivation of a*

17  *constitutional right, within the meaning of section 1983, if he does an*

18  *affirmative act, participates in another's affirmative act, or omits to perform*

19  *an act which he is legally required to do that causes the deprivation of which*

20  *the complaint is made.*" **Hydrick v. Hunter** (9th Cir. 2007) 500 F.3d 978, 988

21  quoting **Johnson v. Duffy** (9th Cir. 1978) 588 F.2d 740, 743.

22  299.   Under circuit law, Defendant Hollywood Tow Service is liable as its policy

23  caused Doe 3 to seize Plaintiff's property. "*Moreover, personal participation is*

24  *not the only predicate for section 1983 liability.  Anyone who 'causes' any*

25  *citizen to be subjected to a constitutional deprivation is also liable.  The*

26  *requisite causal connection can be established not only by some kind of*

27  *direct personal participation in the deprivation, but also by setting in motion*

28  *a series of acts by other s which the actor knows or reasonably should know*

1 *would cause others to inflict the constitutional injury.* [Citation.]" *Id.,* at 988

2 quoting **Johnson**, *supra, 588 F.2d at 743-744.*

3 300.   At all times herein relevant, Defendant Hollywood Tow Service knew of

4 California <u>Vehicle Code</u>, § 22851(b).

5 301.   At all times herein relevant, Defendant Hollywood Tow Service adopted

6 and had a policy of seizing, whenever possible, the key or keys of vehicles it

7 involuntarily tows and/or impounds solely because the key or keys helps at its

8 auction of vehicles by allowing bidders to test start the engine.  Said policy set in

9 motion Doe 3's participation in the seizure of Plaintiff's key.

10 302.   In doing the things herein complained of, Defendants, acting under color of

11 state authority, wrongfully deprived Plaintiff of the use, benefit and enjoyment of

12 his property without probable cause, caused Plaintiff to suffer severe emotional

13 distress, depression and mental anguish.  Accordingly, each said Defendant is

14 separately liable to Plaintiff, under 42 U.S.C. § 1983, for compensatory damages

15 in the amount of $500,000 dollars.

16 303.   The conduct of said Defendants was **criminal**, willful, malicious,

17 demonstrated reckless indifference to the constitutional rights of Plaintiff,

18 oppressive and of the kind and to the degree not tolerated in civilized society.

19 Accordingly, each said Defendant is separately liable to Plaintiff for punitive

20 damages in the amount of $5,000,000 dollars.

21 ## Tenth Claim for Relief

22 **Claim for Relief Against Defendant Ochoa for False Arrest And Excessive**

23 **Force Under Color of State Authority And In Violation Of the First and**

24 **Fourth Amendments**

25 304.   Plaintiff repeats and re-alleges and incorporates by reference the allegations

26 in Paragraphs 1 thru 303, inclusive, above, with the same force and effect as if

27 each herein fully and entirely set forth.

28 305.   On 2008 November 24, Defendant Ochoa, then a sworn employee of the

Los Angeles Police Department, Serial No. 35656, at all times relevant a *"peace officer,"* as defined in California Penal Code § 830.1 and acting in that capacity and under such authority, made a traffic stop of the vehicle being driven by Plaintiff.

306.   Plaintiff was the only occupant of the vehicle.

307.   Plaintiff provided Ochoa with his driver's license, registration and proof of insurance.

308.   While, Ochoa's partner checked Plaintiff for *"wants"* and warrants, Ochoa ordered Plaintiff to exit his vehicle.  Plaintiff saying nothing to Ochoa, exited his vehicle.

309.   Ochoa ordered Plaintiff to walk to the rear of his vehicle and place his hands on the trunk of his car.

310.   Plaintiff saying nothing to Ochoa, complied with the order.

311.   Ochoa searched Plaintiff in a cursory manner, then more thoroughly.

312.   No weapon or contraband was found, nor any tangible thing that could be deemed a threat or hazard to the safety of Ochoa or others and no drugs were found and the search resulted in no prosecution.

314.   Plaintiff, wearing a short-sleeve shirt and shorts was unarmed.

315.   Plaintiff, dressed in clean clothes, was then ordered by Ochoa to sit in the gutter.  Plaintiff complied with Ochoa's order without comment.

316.   Ochoa searched Plaintiff's vehicle.   No weapon or contraband was found and, again, the search resulted in no prosecution.

317.   There were no weapons, nor any tangible thing that could be deemed a threat or hazard to the safety of Ochoa or others and no drugs were found in the vehicle.

318.   No *wants* or warrants were reported as to Plaintiff and the *wants* or warrants inquiry did not result in an arrest, further investigation and did not result in any prosecution.

319. Plaintiff preemptively offered facts as to the status of his vehicle, why registration had not been completed, his employment status and income, efforts to find employment and need for transportation.

320. Ochoa responded that he had stopped Plaintiff's vehicle because it had a broken brake light.

321. Plaintiff responded with incredulity, denying an extant broken brake light. Ochoa smirked that a "*white light was visible when* [Plaintiff] *applied the brakes*".

322. **At all times herein relevant, Plaintiff's brake light was not broken.**

323. Ochoa issued Plaintiff a ticket.

324. Plaintiff repeated that his vehicle did not have a broken brake light but quietly signed the ticket.

325. Ochoa then removed from Plaintiff's key ring the key to Plaintiff's vehicle. and exercised his discretion to cause Plaintiff's vehicle to be impounded.

326. Ochoa watched carefully as Plaintiff removed the contents of Plaintiff's vehicle that Plaintiff could carry.

327. Once Plaintiff had his arms full, Ochoa then ordered Plaintiff to leave. Plaintiff obeyed Ochoa's order, without rejoinder.

328. Plaintiff began walking down the sidewalk carrying items with both hands, walking away from Defendant Ochoa.

329. At approximately 10 to 15 feet from Ochoa, and at that point in time, Plaintiff expressed, over his shoulder and to Ochoa, his intent to complain to the Los Angeles Police Commission about Ochoa's conduct.

330. Ochoa became agitated, stated Plaintiff could complain to his supervisor instead. Plaintiff said no, repeating his intent to complain to the Los Angeles Police Commission about Ochoa's conduct.

331. Plaintiff continued to walk away from Ochoa.

332. At approximately 20 to 25 feet from Ochoa, Ochoa immediately drew his

1  gun, pointed it directly at Plaintiff, ordered Plaintiff to halt, ordered Plaintiff to

2  remain where he was.

3  333.  Plaintiff, in fear of imminent harm or death, complied with each of Ochoa's

4  orders particularly as Ochoa and his partner were armed and Plaintiff was not.

5  334.  Ochoa did not again speak with Plaintiff, did not make any inquiry or

6  conduct further investigation.

7  335.  At no time herein relevant, or at all, did Plaintiff speak with or to Ochoa's

8  partner.

9  336.  At no time herein relevant, or at all, did Ochoa's partner speak with or to

10  Plaintiff.

11  337.  Plaintiff was forced to remain standing on the sidewalk, in the same spot,

12  arms full, for approximately 10 - 15 minutes.

13  338.  Ochoa's supervisor – Omar Cedre (serial # 4542) – then arrived.  Plaintiff

14  asked if he was still under arrest.  The supervisor answered, "No."  Plaintiff

15  walked off.

16  339.  In doing the things herein complained of, Defendant wrongfully deprived

17  Plaintiff of the use, benefit and enjoyment of his freedom, used excessive force in

18  arresting Plaintiff, acted in retaliation for Plaintiff's exercise of his freedom of

19  expression, caused Plaintiff to suffer severe emotional distress, depression and

20  mental anguish and is liable to Plaintiff, under 42 U.S.C. § 1983 for $5,000,000

21  compensatory damages.

22  340.  The conduct of said Defendant was racist, willful, malicious, oppressive and

23  of the kind and to the degree not tolerated in civilized society.  Accordingly, said

24  defendant is separately liable to Plaintiff for $5,000,000 punitive damages.

25  ## Eleventh Claim for Relief

26  **Claim for Relief Against Defendant Hollywood Tow Service, Inc., John X,**

27  **and Ramirez for Seizing Plaintiff's Property in Violation of the Fourth**

28  **Amendment to the Constitution**

341.   Plaintiff repeats and re-alleges and incorporates by reference the allegations in Paragraphs 1 thru 340, inclusive, above, with the same force and effect as if each herein fully and entirely set forth.

342.   On 2008 December 18, Plaintiff traveled to Hollywood Tow Service, to collect his remaining property in his vehicle.

343.   As per its policy, Hollywood Tow Service and its employee (male, Caucasian, mid-50s, approximately 5'8" - wearing a Jacket bearing the name "*John*") demanded Plaintiff relinquish his driver's license in return for being allowed to collecting his property. "*John*" is herein sued under the fictitious name John X as he adamantly refused to provide his full or real name.

344.   Plaintiff relinquished his driver's license.  After relinquishing his driver's license Plaintiff was escorted to his vehicle by a Hollywood Tow Service employee (hereinafter referred to merely as the "*escort*") carrying a two-way radio.

345.   En route to his vehicle, Plaintiff asked the escort if it was the policy of Hollywood Tow Service to take the key of a vehicle being impounded if the key was present.

346.   The escort answered in the affirmative.

347.   Plaintiff stated that such policy was not legal.

348.   The employee repeated it was the policy of Defendant Hollywood Tow Service, Inc., that the key helped with the auction of vehicles by allowing bidders to test start the engine.

349.   Plaintiff is informed and believes and thereon alleges that it is the policy of Defendant Hollywood Tow Service, Inc., to seize the key or keys of vehicles it involuntarily tows and/or impounds solely because the key or keys helps at its auction of vehicles by allowing bidders to test start the engine.

350.   When Plaintiff arrived at his vehicle, he immediately noticed that the quarters in the ashtray had been stolen.  Plaintiff also noticed the key was in the

1  ignition.  Plaintiff removed the key.

2  351.   The escort demanded that Plaintiff return the key.

3  352.   Plaintiff refused.

4  353.   The escort then got on his two-way radio and informed Defendant John X

5  that Plaintiff had taken the key and was refusing to relinquish it.

6  354.   John X then formulated a plan to carry out Hollywood Tow's policy of

7  seizing car keys.

8  355.   John X planned to refuse to return Plaintiff's driver's license unless Plaintiff

9  relinquished his key.  In the meantime, Plaintiff continued retrieving items from

10  his vehicle.

11  356.   When done, Plaintiff returned to John X to retrieve his driver's license.  At

12  that time, John X executed his above plain, refusing to return Plaintiff's driver's

13  license unless Plaintiff relinquished the key to Plaintiff's vehicle.

14  357.   Plaintiff again refused to relinquish his key.

15  358.   A heated discussion ensued between Plaintiff and John X.  Ultimately, John

16  X demanded Plaintiff leave or face trespassing charges. Plaintiff left; with his key

17  but without his driver's license which remained in Defendant Hollywood Tow

18  Service, Inc.'s and John X's possession.

19  359.   Later on the same day, 2008 December 18, Plaintiff presented to the police

20  station of  Hollywood Division of the Los Angeles Police Department for the

21  purpose of filing a police report and swearing out a complaint against John X.

22  360.   For that purpose, on the afternoon of 2008 December 18 an interview was

23  conducted by Defendant Ramirez in a locked room at the Hollywood Division of

24  the Los Angeles Police Department.

25  361.   On the afternoon of 2008 December 18, Ramirez spoke to Plaintiff and

26  identified himself as an employee of the Los Angeles Police Department, a peace

27  officer with the rank of detective (serial # 25992), that he was then on duty, and at

28  all times relevant a "*peace officer*," as defined in California Penal Code § 830.1,

1   and acting in that capacity and under such state authority.

2   362.   At all times herein relevant, Ramirez was armed with a semi-automatic

3   pistol.  Plaintiff was unarmed.

4   363.   On the afternoon of 2008 December 18, Plaintiff explained to Ramirez what

5   had occurred earlier at Hollywood Tow Service, that Plaintiff had retrieved

6   unattached items from his impounded vehicle including the ignition key, that

7   Hollywood Tow Service and its employees had demanded the key be returned, and

8   that upon refusal to return the key John X had refused to return Plaintiff's driver's

9   license.

10  364.   When Plaintiff attempted to explain to Ramirez that state law allowed a

11  motorist to remove **all** non-attached items from his or her impounded vehicle,

12  Ramirez responded with derision.

13  365.   Plaintiff took umbrage but being in a <u>locked</u> room at a police station,

14  remained civil at home times but held to his position.  Also, Ramirez was armed

15  with a semi-automatic pistol.  Plaintiff was unarmed.  Plaintiff's position being

16  that his automobile's key had nothing to do with John X seizing Plaintiff's driver's

17  license.

18  366.   Ramirez telephoned Hollywood Tow Service and spoke with John X.

19  367.   Ramirez encouraged and approved John X's conduct, and formulated a plan.

20  368.   Defendants decided  Ramirez would take possession of Plaintiff's driver's

21  license.

22  369.   On or about 2008 December 19, Ramirez, acting within his capacity as an

23  employee of the Los Angeles Police Department, a peace officer with the rank of

24  detective (serial # 25992), then on duty, and at all times relevant a "*peace*

25  *officer*," as defined in California Penal Code § 830.1, and acting within the plan

26  devised between him and John X seized and took possession of Plaintiff's driver's

27  license, without warrant or probable cause and without Plaintiff's consent;

28  Ramirez "*booked*" Plaintiff's driver's license "*into evidence.*"

370.   Ramirez investigated Plaintiff, using the investigation as a pretext and cover for having seized Plaintiff's license.

371.   Plaintiff's driver's license was never returned.  At no time herein relevant, or ever, did Defendants, or any of them, provide or afford post-deprivation hearings for seized car keys and/or seized driver's licenses.

372.   Plaintiff ultimately had to apply for and obtain a replacement driver's license at the Department of Motor Vehicles at a cost of $55 dollars and much time.

373.   Until obtaining the replacement driver's license, Plaintiff was unable to operate a motor vehicle in the state of California.

374.   In doing the things herein complained of, at all times relevant, John X was an employee of Defendant Hollywood Tow, acting within the course and scope of that capacity and pursuant to Defendant Hollywood Tow's above-described key-seizing policy.  Accordingly, Defendant Hollywood Tow is vicariously liable for John X's conduct.

375.   In doing the things herein complained of, Defendants, acting under color of state authority, wrongfully seized without warrant or probable cause and deprived Plaintiff of the use, benefit and enjoyment of his property, caused Plaintiff to suffer severe emotional distress, depression and mental anguish.  Accordingly, each said Defendant is separately liable to Plaintiff, under 42 U.S.C. § 1983, for compensatory damages in the amount of $500,000 dollars.

376.   The conduct of said Defendants was **criminal**, willful, malicious, oppressive and of the kind and to the degree not tolerated in civilized society. Accordingly, each said Defendant is separately liable to Plaintiff for punitive damages in the amount of $5,000,000 dollars.

///

///

///

# Twelfth Claim for Relief

**Claim for Relief Against Defendant Ramirez for Assault under Color of State Authority In Violation Of The First And Fourteenth Amendments**

377.   Plaintiff repeats and re-alleges and incorporates by reference the allegations in Paragraphs 1 thru 376, inclusive, above, with the same force and effect as if each herein fully and entirely set forth..

378.   On the afternoon of 2008 December 18, Plaintiff presented to the Hollywood Division of the Los Angeles Police Department for the purpose of filing a police report.

379.   For that purpose, on the afternoon of 2008 December 18 an interview was conducted by Defendant Ramirez in a locked room at the Hollywood Division of the Los Angeles Police Department.

380.   On the afternoon of 2008 December 18, Ramirez spoke to Plaintiff and identified himself as an employee of the Los Angeles Police Department, a peace officer with the rank of detective, that he was then on duty, and at all times relevant a *"peace officer,"* as defined in California Penal Code § 830.1, and acting in that capacity and under such state authority.

381.   At all times herein relevant, Ramirez was armed with a semi-automatic pistol.  Plaintiff was unarmed.

382.   Plaintiff explained to Ramirez the events that had occurred earlier that day at Hollywood Tow Service involving Defendant John X's theft of Plaintiff's driver's license.

383.   That is, Plaintiff explained to Ramirez that Hollywood Tow Service had seized and was holding Plaintiff's vehicle and property pursuant to state law.

384.   Plaintiff explained to Ramirez he had gone to Hollywood Tow Service to retrieve chattel from his vehicle as allowed under the California Vehicle Code.

385.   Plaintiff further explained to Ramirez that he when he had arrived at Hollywood Tow Service, an employee wearing a jacket bearing the name of John

1  required Plaintiff to relinquish his driver's license as a condition of retrieving his

2  chattel property.

386.  When Plaintiff attempted to explain to Ramirez that the California Vehicle

4  Code allowed a motorist to remove **all** non-attached items from his or her

5  impounded vehicle, Ramirez responded with derision.

387.  Plaintiff took umbrage but being in a <u>locked</u> room at a police station,

7  remained civil at home times.

388.  Plaintiff held to his position that the California Vehicle Code allowed a

9  motorist to remove **all** non-attached items from his or her impounded vehicle.

389.  Plaintiff's held to his position that his automobile's key had nothing to do

11  with John X stealing Plaintiff's driver's license.

390.  Ramirez then telephoned Hollywood Tow Service and spoke with John X.

391.  Upon cessation of his buddy chat with Defendant John X, Ramirez informed

14  Plaintiff that Plaintiff was at fault.

392.  Ramirez represented that John X had stated that he was just following

16  company policy and was allowed by state law to retain Plaintiff's car key.

393.  Plaintiff repeated to Ramirez that under the California Vehicle Code,

18  Plaintiff was entitled to retrieve the ignition key.

394.  Plaintiff stated to Ramirez that Plaintiff's key should never have been taken

20  in the first instance.

395.  Plaintiff revealed to Ramirez that Plaintiff had complained about Defendant

22  Ochoa to the Los Angeles Police Commission.

396.  Plaintiff was standing approximately three feet from Ramirez at this time.

24  Plaintiff had the opportunity to observe and did observe Ramirez' facial

25  expression.  Plaintiff observed from Ramirez' facial expression that the above

26  revelation agitated Ramirez.

397.  Defendant Ramirez demanded that Plaintiff cite the specific state law

28  Plaintiff was claiming allowed a motorist to remove all unattached items from his

or her impounded vehicle.

398. Plaintiff replied curtly that he had not memorized the California Vehicle Code.

399. Ramirez then deliberately threw a California Vehicle Code book at Plaintiff forcefully striking Plaintiff.

400. Ramirez demanded Plaintiff locate and quote the specific section of the Vehicle Code verbatim.

401. Plaintiff began to do so but then stopped, recovered, and adamantly refused to proceed.

402. The blow from the book, Plaintiff later discovered, caused a contusion.

403. Plaintiff, fearing immediate bodily harm, walked out.

404. At all times herein relevant, under federal law, 18 USC § 242, Plaintiff had the right not to suffer, on account of his race, different punishment, pain or penalty, by a person acting under color of state authority.

405. In doing the things herein complained of, Defendant retaliated against Plaintiff as a consequence of Plaintiff having complained to the Los Angeles Police Commission against Ochoa - Ramirez' fellow officer. Defendant thereby violated Plaintiff's First Amendment right to seek redress from government.

406. In doing the things herein complained of, Defendant acted to impose *summary* punishment upon Plaintiff on account of Plaintiff's race by harassing Plaintiff and throwing a book at Plaintiff in violation of Plaintiff's Fourth and Fourteenth Amendment rights to due process of law.

407. In doing the things herein complained of, Defendant wrongfully deprived Plaintiff of his federal right to be free from excessive force by a person acting under color of state authority, and his federal right to be free from different punishment, pain or penalty on account of Plaintiff's race by a person acting under color of state authority.

/ / /

408.   In doing the things herein complained of, Defendant wrongfully caused Plaintiff to suffer severe emotional distress, depression and mental anguish. Accordingly, said Defendant is liable to Plaintiff, under 42 U.S.C. § 1983, for compensatory damages in the amount of $500,000 dollars.

409.   The conduct of Ramirez was **racist**, willful, malicious, oppressive and of the kind and to the degree not tolerated in civilized society.  Accordingly, Ramirez is liable to Plaintiff for punitive damages in the amount of $5,000,000 dollars.

## Thirteenth Claim for Relief

**Claim for Relief Against the State of California - Law Unconstitutional Per Se And As Applied**

**(NOTE:  The Thirteenth Claim for Relief, First Amended Complain, was dismissed with prejudice on or about 2011 April 11. [Order, Doc. 75]. Accordingly, at this time Defendant State of California need not respond to Plaintiff's Claim for unconstitutional statute.)**

410.   Plaintiff repeats and re-alleges and incorporates by reference the allegations in Paragraphs 1 thru 409, inclusive, above, with the same force and effect as if each herein fully and entirely set forth.

411.   The title of Plaintiff's vehicle impounded by Ochoa was free and clear.  The equity in said vehicle was approximately $4,000 dollars.  Unable to redeem said vehicle, Plaintiff demanded that it be auctioned at the next weekly auction so as to not lose or see diminished Plaintiff's property interest in his equity.

412.   Hollywood Tow Service applied California law, Civil Code, § 3072(c)(2), which requires that a vehicle be impounded **not less than** thirty days before being auctioned.

413.   Said law is unconstitutional *per se* and as applied in that the state has no interest in forcing a vehicle to be impounded thirty days no matter what, it constitutes a transfer of property without compensation in that the private tow company realizes an unnecessary and unjustified profit at the expense of the car

1  owner and imposition of the law is automatic and the owner is without any
2  recourse whatsoever.
3  414.   Accordingly, Plaintiff seeks a declaration declaring the law unconstitutional
4  as it violated the due process clause of the Fifth and Fourteenth Amendments.

5                          **Fourteenth Claim for Relief**

6      **Claim for Relief Against Hollywood Tow Service, Inc. For An Accounting**
7  (**NOTE**:  **The Fourteenth Claim for Relief, First Amended Complain, was**
8  **dismissed with prejudice on or about 2011 April 11. [Order, Doc. 75]**
9  **Accordingly, at this time Defendant Hollywood Tow Service  need not**
10 **respond to Plaintiff's Claim for an accountin**g.)

11
12 415.   Plaintiff repeats and re-alleges and incorporates by reference the allegations
13 in Paragraphs 1 thru 414, inclusive, above, with the same force and effect as if
14 each herein fully and entirely set forth.
15 416.   At all times herein relevant, Hollywood Tow Service has refused and
16 resisted informing Plaintiff of the disposition of his vehicle, a 1995 Honda Civic,
17 California license plate # 5PQZ449 (Vehicle No. 3).
18 417.   Wherefore, Plaintiff requests defendant be ordered to provide an accounting
19 of the disposition of said vehicle including the receipt and distribution of any
20 money received as the result of an auction of said vehicle.

21
22                          **PRAYER FOR RELIEF**
23 1.      As to each Claim for Relief, the actual, nominal, compensatory, punitive
24 damages, and statutory damages specifically requested in the Complaint and each
25 said request is completely incorporated herein by this reference as though fully set
26 forth at length with equal force and effect;
27 2.      As to each Claim for equitable relief, such relief as requested in the
28 Complaint;

3.    For costs of suit incurred herein;

4.    That reasonable attorney fees be awarded; and,

5.     For such other and further relief as to the court may seem just.

DATED:                    **Sunday**, 2011 May 01

By:

B. Benedict Waters
Plaintiff, *Pro se*

### DEMAND FOR JURY TRIAL

Plaintiff hereby requests and demands that this within matter be tried to a jury of his peers before a United States District Judge.

///

DATED:                    **Sunday**, 2011 May 01

By:

B. Benedict Waters
Plaintiff, *Pro se*

| | | |
|---|---|---|
| 12:51:20 | 1 | Q    I want to direct your attention back to |
| | 2 | Exhibit 10, the letter dated November 18th, 2008. |
| | 3 | So as I understand it, you are disputing |
| | 4 | the accuracy of the Rickenbacker accounts for |
| 12:51:38 | 5 | several reasons; correct? |
| | 6 | A    Yes. |
| | 7 | Q    One of those reasons is that you believe |
| | 8 | that Hollywood Tow illegally seized those vehicles; |
| | 9 | correct? |
| 12:51:53 | 10 | A    No. |
| | 11 | Q    Is another one of the reasons that you |
| | 12 | believe that neither Hollywood Tow nor Rickenbacker |
| | 13 | was entitled to charge interest on these accounts? |
| | 14 | A    No. |
| 12:52:26 | 15 | Q    You testified earlier that you did not |
| | 16 | believe that Rickenbacker or Hollywood Tow could |
| | 17 | report amounts or try to collect amounts from you |
| | 18 | that included interest; correct? |
| | 19 | A    Correct. |
| 12:52:49 | 20 | Q    Then can you identify for me all the |
| | 21 | specific reasons why you believe the information |
| | 22 | contained in these Rickenbacker accounts was |
| | 23 | inaccurate? |
| | 24 | A    Well, this would be the third time that |
| 12:53:09 | 25 | I've done that in this deposition.  (1), the |

88

12:53:19  1  information lists the reasonable creditor as

2  Hollywood Tow, and Hollywood Tow is not a creditor

3  as a matter of law.  It is not my creditor as a

4  matter of law.

12:53:39  5       Q    Okay.

6       A    The information lists a credit account of

7  one month's term.  I have never had a credit account

8  with Hollywood Tow and, by extension, there has

9  never been a credit account with a one-month term.

12:54:03  10  The information states that the account is overdue.

11  That is also incorrect in that there was no account

12  to be overdue because I never had an account with

13  Hollywood Tow.

14       And the information states that --

12:54:27  15  certainly by implication, that there was a credit

16  transaction.  There was never a credit transaction

17  with Hollywood Tow.  And the information lists a

18  balance owing that includes interest.  And there has

19  never been any interest permitted by law or

12:54:53  20  authorized by me.

21       All of these facts have been admitted to

22  by Hollywood Tow in their answer to the first

23  amended complaint.  And additionally, in their

24  initial disclosures they've also revealed that the

12:55:13  25  information where it purports to be an assignment of

89

12:55:17   1   debt is incorrect as well as there was no assignment

2   of debt.

3            Now, that wasn't raised in my complaint,

4   but it is inaccurate information and we certainly

12:55:31   5   intend to amend the complaint to add that

6   allegation, along with others.

7       Q    So those are all the reasons why you

8   believe that the Rickenbacker accounts were reported

9   inaccurately by Experian; correct?

12:55:50   10      A    No.  I believe that those are the

11   reasons -- those are the items of information that

12   are -- were incorrectly reported by Experian.

13      Q    Okay.

14      A    And were incorrectly reported to Experian

12:56:02   15   by Rickenbacker and Juan Casas.

16      Q    And there aren't any other reasons that

17   you can identify here today other than the reasons

18   just discussed; correct?

19      A    Not today, no.

12:56:15   20      Q    Are there any documents you might review

21   that would enable you to discuss other reasons why

22   you believe that these accounts were inaccurately

23   reported?

24      A    Excuse me.  I have -- as I sit here today,

12:56:29   25   I have no way of knowing one way or another if the

90

PLAINTIFF'S EXHIBIT
ELITE COURT REPORTING (949) 829-9222
Page ___ of ___ Pages                    EXHIBIT __ PAGE 6

```
12:56:32    1   documents I have requested turn out to be the

            2   documents to be produced and the defendants refused

            3   to produce those documents.

            4       Q    So you disagree with the way that Experian

12:56:45    5   characterized these things appearing on your

            6   personal credit file; correct?

            7       A    Your question is ambiguous and I object to

            8   it on that basis.  I have no idea what you mean by

            9   "characterize."

12:56:59   10           I object to -- the lawsuit is based upon

           11   information reported by Experian -- as to your

           12   client, the lawsuit is based upon information

           13   reported by Experian is incorrect.  That's

           14   inaccurate.  The information Experian reported as

12:57:16   15   the basis of this litigation is inaccurate

           16   information.

           17       Q    Okay.  And the reasons you just listed as

           18   a matter of law, Hollywood creditor -- Hollywood Tow

           19   is not a creditor, that's a legal reason; correct?

12:57:30   20       A    Yes.

           21       Q    And also that you -- there was no -- you

           22   believe that Hollywood Tow legally could not create

           23   a credit account with you?

           24       A    Correct.

12:57:44   25       Q    And that because Hollywood Tow legally
```

91

| | | |
|---|---|---|
| 12:57:48 | 1 | couldn't create a credit account with you, it would |
| | 2 | be inaccurate to report it as being overdue; |
| | 3 | correct? |
| | 4 | A    Correct. |
| 12:57:57 | 5 | Q    And that because Hollywood Tow legally |
| | 6 | couldn't report a credit account on you, there was |
| | 7 | never any credit transaction in the first place; |
| | 8 | correct? |
| | 9 | A    Correct. |
| 12:58:09 | 10 | Q    And because Hollywood Tow legally couldn't |
| | 11 | report a credit account on you, Experian couldn't |
| | 12 | report any balance owing on that account? |
| | 13 | A    Correct. |
| | 14 | Q    And -- |
| 12:58:23 | 15 | A    Subsequently to -- in this litigation, in |
| | 16 | their answers to the first amended complaint they've |
| | 17 | admitted all that. |
| | 18 | Q    Okay.  And because you believe Hollywood |
| | 19 | Tow legally could not report this information, that |
| 12:58:38 | 20 | Experian could not report that the Ricken- -- |
| | 21 | Rickenbacker account was assigned to Rickenbacker |
| | 22 | from Hollywood Tow; correct? |
| | 23 | A    No.  That's not correct. |
| | 24 | Q    Okay.  Why do you believe that Experian |
| 12:59:06 | 25 | could not report any information on the assignment |

92

ELITE COURT REPORTING (949) 829-9222

PLAINTIFF'S EXHIBIT
Page 5 of 7 Pages

A

EXHIBIT 1 PAGE 8

13:00:37    1  procedures to prevent the reporting of that

2  inaccurate information.  That is the issue in this

3  litigation.

4           (2), your question assumes there was a

13:00:43    5  debt.  And there was no debt.

6      Q    So you're saying -- what you're saying is

7  that because there was no debt stemming from the

8  fact that Hollywood Tow had no legal right to

9  acquire any type of debt against you, that this

13:01:04   10  information was inaccurately reported?

11     A    No.

12     Q    Why don't you think that there was a debt?

13     A    Because there wasn't.  There wasn't --

14  there was no adjudication.  There was no -- it would

13:01:29   15  be like my saying now, before the issue goes to

16  trial, that Jones Day owes me $200,000 for violating

17  the Fair Credit Reporting Act.  Well, that may be

18  construed -- that may constitute a claim, but does

19  not constitute a debt.  That is my opinion.

13:01:47   20          So (1), there is no debt.  (2), there is

21  no debt because although Hollywood Tow has carefully

22  withheld the contract between itself and the City of

23  Los Angeles, until a disputed seizure is resolved,

24  the vehicle owner does not owe any money to

13:02:06   25  Hollywood Tow.  If the dispute is resolved in favor

94

```
13:02:11    1   of the motorist, then the City of Los Angeles pays

            2   any costs incurred in the seizure of the vehicle,

            3   not the motorist.

            4        Q    So there was no debt because the disputed

13:02:21    5   procedure, the seizure of that vehicle, had not been

            6   resolved?

            7        A    Correct.

            8        Q    Okay.

            9        A    And there was no debt -- just because

13:02:29   10   Hollywood Tow says there's a debt does not make it a

           11   debt.

           12        Q    Okay.  Thank you.

           13             I'm handing you what's been marked as

           14   Exhibit 11.

13:02:45   15             (Defendant's Exhibit 11 was marked

           16   for identification by the deposition officer and is

           17   attached hereto.)

           18   BY MR. HARDEMAN:

           19        Q    I can represent to you, Mr. Waters, that

13:02:53   20   this report dated November 24th, 2008 is Experian's

           21   response to the letter we previous dis- -- we

           22   previously discussed dated November 18th, 2008,

           23   dated (sic) Exhibit 10.

           24             Are you prepared to testify about the

13:03:18   25   contents of this report?
```

95

PLAINTIFF'S EXHIBIT **A**
ELITE COURT REPORTING (949) 829-9222
Page __7__ of __7__ Pages          EXHIBIT __1__ PAGE __10__

latimes.com/news/local/la-me-bell-impounds-20100906,0,2022422.story

# latimes.com

## Impounded cars boost Bell's coffers

### Police say they were pushed to find cars to tow. Authorities say the practice discourages gangs but will be changed.

By Paloma Esquivel, Los Angeles Times

7:47 PM PDT, September 5, 2010

As city administrators' salaries were rocketing upward in Bell and council members' stipends were among the highest in the state, the city went on an aggressive push to increase municipal revenue by impounding cars in the city, police officers say.

Officers in this poor, largely immigrant community were pushed to have more cars towed and, at one point, were given what some patrol officers said amounted to a daily quota. Several officers said they were reprimanded when they failed to find cars to tow and were warned that City Hall jobs could be at risk if impounds did not accelerate.

At the same time, the city charged one of the highest impound release fees in the area and benefited from an agreement with a single towing company, from which it collected additional fees every time a car was impounded.

"It really changed our culture," said police Sgt. Art Jimenez. "Rather than being police officers and being proactive looking for crime, we were out there looking for vehicles to impound."

Capt. Anthony Miranda, who has helped lead the department since Chief Randy Adams resigned in July, said that officers were never given a quota but that in 2009 they were given a daily goal of towing two cars, writing three moving violation tickets and making one arrest. He said the goal was to make the city an undesirable place for gang members by cracking down on traffic enforcement.

Impounding cars, usually because the drivers are unlicensed, has been a steady revenue stream in Bell for years. In the last fiscal year, the city expected to make more than $770,000 from release fees, which would amount to between 2,000 and 2,500 impounds per year. The previous year, the department made more than $834,000.

The city charges unlicensed motorists a $300 fee to release the car; those charged with driving under the influence are charged $400. The number does not include costs imposed by the impound lot, which starts with a $104 base fee and increases $27 per day.

By contrast, Simi Valley, which has a population three times Bell's, brings in about $61,000 a year from impound fees and charges $77 to release impounded cars, officials said. In unincorporated Los Angeles County, drivers pay $93 to get a vehicle released. The amount, experts said, is meant to recoup costs



**PLAINTIFF'S EXHIBIT  B**

**Page  1  of  3  Pages**

Case 2:10-cv-05298-CAS-AJW   Document 85   Filed 08/02/11   Page 67 of 71   Page ID #:2068

involved in towing the vehicle, not to make a profit for the city. In all three areas, additional fees for towing and storage are paid directly to the towing company.

In Bell, towing and storage fees were compounded by an agreement with Bell Tow Service Inc. that allowed the city to collect a separate fee of 10% per impound, which generated tens of thousands of dollars per year.

The enforcement policy may have been aimed at gang members and undesirables, but it put a heavy burden on others too. Dr. Mary Romo was among those who said she witnessed the effect of the aggressive towing practice on the community.

Her patients, some pregnant or in need of medical attention, had their cars towed and impounded so frequently while en route to her office or the hospital that she started keeping track, adding names, dates and ticket information to a folder she kept next to her patients' medical files. She said she complained to the city but never got an answer.

"This is a real problem. It's not just my patients, it's everybody in the community that's suffering," said Romo, an obstetrician and gynecologist. "It's a poor community."

The result of the crackdown on impounds was a Police Department heavily focused on traffic enforcement, often to the exclusion of other problems, officers said.

For some, the emphasis on impounds meant patrol time was spent pulling over drivers for small infractions in the hope they would turn out to be unlicensed. Although officers didn't look exclusively for immigrants, it was clear that the majority turned out to be illegal immigrants, Owens said. Undocumented immigrants cannot obtain driver's licenses.

"We developed an intuition" for unlicensed drivers, said Officer Kurt Owens. "We'd look for younger guys in their 20s and 30s, guys with junkier cars, broken lights, loud music or tinted windows. Sometimes it was a car that stopped 50 feet before an intersection if they spotted you. They'd cross themselves or touch their religious figures."

Owens, a 23-year department veteran, filed lawsuits last year in federal and state court saying he was punished for refusing to go along with a department-mandated quota for impounds, tickets and arrests. The suits were settled in his favor last week, Owens said.

The emphasis on impounds started early in the decade and fluctuated slightly under the direction of a rotating cast of police chiefs but always remained a key part of the job, officers said.

"It got really bad in 2008, 2009," Jimenez said. "They weren't hiding it. They were directly asking for these impounds. Some officers were being called in and asked to impound cars. They would keep these stat sheets on us and it would say how many arrests, how many cites we've written throughout the week, month and year.

"In these stat sheets the number they were really looking for was impounds.... That's not the way police work should be measured," he said.

Officer Gilbert Jara, president of the Bell Police Officers Assn., said officers were called in and told to increase impounds.

PLAINTIFF'S EXHIBIT **B**
Page **2** of **3** Pages

"If you weren't doing a specific amount of activity regarding impounds, they would call you in and tell you, 'Why are your stats low? Pick them up.' So you'd go around and do your business and start picking them up.... That was the mentality. A cop would feel like that was his job now."

One police official, who asked that his name not be used, said that in early 2009 he was called to a meeting with a police captain and told he would be held personally responsible if impounds did not go up.

James Corcoran, a former Bell police officer who has filed a wrongful-dismissal suit against the city, complained to city leaders in 2009 that the department was towing cars to generate revenue. The majority of vehicles that were seized were not a danger to the community, he said.

Miranda, the captain, said officers were never pressured to focus only on impounds, but he said the department stressed traffic enforcement as a crime-reducing strategy.

"The thought was that if gang members and drug dealers knew there was a high probability of being stopped in Bell, they'd stay away," he said. "And it would improve traffic safety and pedestrian safety."

"If you're very aggressive on traffic, you'll have high impounds," Miranda said.

The goal set in early 2009 of three moving citations, two impounds and one arrest per day were not a quota but a recommendation, and the department quickly abandoned the strategy, Miranda said.

In the aftermath of the city's upheaval, Miranda said the department is moving away from traffic-oriented policing and is looking into reducing impound fees, he said. He has also recommended that the city stop contracting with a single tow company, a practice he said is unusual.

"At this point," Miranda said, "we're comfortable with what we're doing as far as our traffic accident rates. And we really want to regain the public's trust."

*paloma.esquivel@latimes.com*

Copyright © 2010, Los Angeles Times

PLAINTIFF'S EXHIBIT B
Page 3 of 3 Pages


# PROOF OF SERVICE

I, Arlene Johnson, the undersigned, certify and declare that I am over the age of 18, employed in the County of Los Angeles, California, and not a party to the within cause.

On 2011 May 02, I served a true copy of:

**Second Amended Complaint**     DEMAND FOR JURY TRIAL

by depositing it in the United States Mail, at Los Angeles, California, in a sealed envelope with the postage thereon fully prepaid addressed to the following:

Mark R. Beckington
Office of the Attorney General
300 South Spring Street, Suite 1702
Los Angeles, California 90013

Office of City Attorney
200 N. Main St., 9th Flr, City Hall East
Los Angeles, CA 90012

Liedle, Looney, Larson & Lidl, LLP
12520 High Bluff Drive, Suite 200
San Diego, California 92130

I hereby certify under the penalty of perjury that the foregoing is true and correct. Executed May 02, at Los Angeles, California.

_____
Signature of Person Making Service

Name & Address:
B. Benedict Waters
6230 Wilshire Blvd., # 182
Los Angeles, CA 90048-5104
310-967-3943

**FOR OFFICE USE ONLY**

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| B. Benedict Waters | CASE NUMBER |
|---|---|
| | CAS (AJWx) |
| PLAINTIFF(S) | 10-CV-05296-DMG-(JCGx) |
| v. | |
| Attachment "A" incorporated herein by this reference as though fully set forth | **SUMMONS** |
| DEFENDANT(S). | |

TO:   DEFENDANT(S): _____

A lawsuit has been filed against you **FOR OFFICE USE ONLY**

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☐ complaint ☒ Second _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, B. Benedict Waters _____, whose address is 6230 Wilshire Blvd., # 182  Los Angeles, CA  90048-5104 _____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: _____MAY - 2 2011_____        By: _____JOHN SEAL OPEZ_____
                                                        Deputy Clerk

                                                    *(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

**FOR OFFICE USE ONLY**

# Attachment "A"

Howard Sommers Towing, Inc.,

Hollywood Tow Service, Inc.,

LDC Collection Systems, Inc.,

Steve Thompson,

John X,

John Doe 1,

John Doe 2,

John Doe 3,

Rita L. Robinson,

City of Los Angeles,

Ciro Ochoa,

Steven Ramirez,

Jerry Brown, in his official capacity,

Kamala Harris, in her official capacity, and

State of California