# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL   'O'

| Case No. | 2:10-cv-05296-CAS(AJWx) | Date | August 12, 2014 |
|---|---|---|---|
| Title | B. BENEDICT WATERS V. HOWARD SOMMERS TOWING, INC., ET AL. | | |

| Present: The Honorable | CHRISTINA A. SNYDER | |
|---|---|---|
| Catherine Jeang | Not Present | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants |
|---|---|
| Not Present | Not Present |

**Proceedings:**        **(In Chambers:)** PLAINTIFF'S MOTION FOR TRANSFER (Lodged August 6, 2014)

**(In Chambers:)** PLAINTIFF'S MOTION FOR RECONSIDERATION RE: ELEVENTH CLAIM FOR RELIEF (Lodged August 6, 2014)

**(In Chambers:)** PLAINTIFF'S REPLY TO DEFENDANT CITY OF LOS ANGELES'S OPPOSITION TO MOTION FOR ORDER REVERSING THE DISMISSAL OF THE FOURTH, FIFTH, AND SEVENTH CLAIMS FOR RELIEF (Lodged August 6, 2014)

**(In Chambers:)** PLAINTIFF'S REPLY TO DEFENDANT HOLLYWOOD TOW SERVICE, INC.'S MOTION FOR ORDER REVERSING THE DISMISSAL OF THE FOURTH, FIFTH, AND SEVENTH CLAIMS FOR RELIEF (Lodged August 6, 2014)

**(In Chambers:)** ORDER VACATING NOTICE OF DOCUMENT DISCREPANCIES AND ORDER (Dkt. #299, filed August 8, 2014)

## I.    INTRODUCTION

Plaintiff filed the instant action in this Court on July 19, 2010. Following motion practice that disposed of several of plaintiff's claims, the Court held a jury trial on

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**            'O'

| Case No. | 2:10-cv-05296-CAS(AJWx) | Date | August 12, 2014 |
|----------|--------------------------|------|-----------------|
| Title | B. BENEDICT WATERS V. HOWARD SOMMERS TOWING, INC., ET AL. | | |

plaintiff's remaining claims beginning on April 30, 2013.  On May 7, 2013, the jury returned a special verdict.  Dkt. #258.  The jury found against plaintiff with respect to all of his remaining claims, with the exception of plaintiff's claim that Officer Ciro Ochoa of the Los Angeles Police Department unlawfully conducted a pat-down search of plaintiff after subjecting him to a traffic stop.  Id.  Regarding the latter claim, the jury was unable to reach a verdict.  A new trial is scheduled to commence on that claim on September 9, 2014.

As an initial matter, the Notice of Document Discrepancies and Order issued on August 8, 2014, see dkt. #299, was issued in error.  That order is hereby VACATED.  The present order shall supersede the August 8, 2014 Notice of Document Discrepancies and Order.

On August 6, 2014, plaintiff B. Benedict Waters lodged the above-captioned motion to transfer, motion for reconsideration, and two reply briefs with this Court.  As plaintiff has been designated a vexatious litigant, he is not permitted to file pleadings without leave of Court.  The Court addresses each of these filings in turn.

## II.    PLAINTIFF'S MOTION TO TRANSFER

The Court concludes that this document, attached hereto, may not be filed.

## III.    PLAINTIFF'S MOTION FOR RECONSIDERATION RE: ELEVENTH CLAIM FOR RELIEF

The Court concludes that this motion may be filed.  Additionally, the Court finds this motion appropriate for decision without oral argument.  Fed. R. Civ. P. 78; Local Rule 7-15.  Accordingly, the hearing date of September 8, 2014, is vacated, and the matter is hereby taken under submission.

In this motion, plaintiff seeks reconsideration of the Court's dismissal of the eleventh claim for relief in the second amended complaint ("SAC"), dkt. #97.  In that order, the Court found that plaintiff had not alleged facts to support his claim that his Fourth Amendment rights were violated when he provided his driver's license to an employee of a tow yard.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**          **'O'**

| Case No. | 2:10-cv-05296-CAS(AJWx) | Date | August 12, 2014 |
|----------|--------------------------|------|------------------|
| Title | B. BENEDICT WATERS V. HOWARD SOMMERS TOWING, INC., ET AL. | | |

### B.    Legal Standard

Local Rule 7-18 sets forth the bases upon which the Court may reconsider the decision on any motion:

> A motion for reconsideration of the decision on any motion may be made only on the grounds of: (a) a material difference in fact or law from that presented to the Court before such decision that in the exercise of reasonable diligence could not have been known to the party moving for reconsideration at the time of such decision, or (b) the emergence of new material facts or a change of law occurring after the time of such decision, or (c) a manifest showing of a failure to consider material facts presented to the Court before such decision.  No motion for reconsideration shall in any manner repeat any oral or written argument made in support of or in opposition to the original motion.

L.R. 7-18.

### C.    Discussion

The Court has reviewed and considered the assertions set forth in plaintiff's motion, and concludes that plaintiff has not set forth additional law or facts that would justify reconsideration of the Court's prior order.  Similarly, plaintiff has not set forth a "manifest showing of a failure to consider material facts" previously presented to the Court.  See L.R. 7-18.

### D.    Conclusion

Accordingly, the Court hereby DENIES plaintiff's motion for reconsideration.

## IV.    PLAINTIFF'S REPLY TO DEFENDANT CITY OF LOS ANGELES'S OPPOSITION TO MOTION FOR ORDER REVERSING THE DISMISSAL OF THE FOURTH, FIFTH, AND SEVENTH CLAIMS FOR RELIEF

The Court concludes that this document may be filed, pursuant to the Court's order dated July 24, 2014.  See dkt. #295.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**          **'O'**

| Case No. | 2:10-cv-05296-CAS(AJWx) | Date | August 12, 2014 |
|---|---|---|---|
| Title | B. BENEDICT WATERS V. HOWARD SOMMERS TOWING, INC., ET AL. | | |

## V.    PLAINTIFF'S REPLY TO DEFENDANT HOLLYWOOD TOW SERVICE, INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR ORDER REVERSING THE DISMISSAL OF THE FOURTH, FIFTH, AND SEVENTH CLAIMS FOR RELIEF

The Court concludes that this document may be filed, pursuant to the Court's order dated July 24, 2014.  <u>See</u> dkt. #295.

IT IS SO ORDERED.

|  | 00 | : | 00 |
|---|---|---|---|
| Initials of Preparer | | CMJ | |

B. Benedict Waters
6230 Wilshire Boulevard, # 182
Los Angeles, Calif 90048-5104
310.967.3943 ● Plaintiff, Pro Se

# United States District Court
# Central District of California

| | |
|---|---|
| B. Benedict Waters, | Case # **10-CV-05296**-CAS (AJWx) |
| *Plaintiff*, | |
| vs. | ***Plaintiff's Notice and Motion*** |
| | ***For Transfer To Non-Jewish*** |
| Howard Sommers Towing, Inc., | ***Judge On Religious Grounds*** |
| Hollywood Tow Service, Inc., | |
| LDC Collection Systems, Inc., | **Burwell V. Hobby Lobby Stores,** |
| Steve Thompson, | **Inc.** (2014) 573 U.S. \_\_\_\_\_ |
| John X, | |
| John Doe 1, | Religious Freedom Restoration Act |
| John Doe 2, | of 1993 (RFRA), 42 U. S. C. |
| John Doe 3, | §2000bb *et seq.* |
| Rita L. Robinson, | |
| City of Los Angeles, | DATE:     **2014 SEPT 08** |
| Ciro Ochoa, | TIME:     **10:00 AM** |
| Steven Ramirez, | DEPT:     **COURTROOM 5** |
| Jerry Brown, in his official capacity, | |
| and Kamala Harris, | |
| in her official capacity, | |
| *Defendants*. | |



# **Table of Contents**

Memorandum of Facts and Law   . . . . . . . . . . . . . . . . . .   3 - 24

Statement of Law . . . . . . . . . . . . . . . . . . . . . . . . . .   3

    1.    The RFRA Is Applicable To All Branches Of The
          Federal Government . . . . . . . . . . . . . . . . . . . . . .   3

Statement of Fact   . . . . . . . . . . . . . . . . . . . . . .   6 - 8

Discussion      . . . . . . . . . . . . . . . . . . . .   9 - 24

    1.    B. Benedict Waters v. Hollywood Tow Service, Inc.,
          et al., Case No. 07-cv-07568 CAS  ("the 2007 Case")   10 - 12

    2.    B. Benedict Waters v. Juan Carlos Casas, et al.,
          Case No. 09-cv-07696 CAS ("the 2009 Case")  . . . .   12 - 18

        a.    Jews Actions And Criminal Conduct Regarding
             Casas' Default Made A Mockery Of American
             Justice System . . . . . . . . . . . . . . . .   12 - 14

        b.    The Jewish Law Firm Procured a Jew to
             Commit Perjury  . . . . . . . . . . . . . . . .   14

        c.    Snyder's Dumping Of Rickenbacker Group's
             Default Was Prototypical Jewish Disregard
             For Non-Jewish Law  . . . . . . . . . . . . . . . .   15

             d.       Snyder's Wiping Out Robinson's Default
Accents Traditionalist Catholic Doctrine
re Jews — Unless The Rules of Quantum
Physics Are Null And Void . . . . . . . . . . .   15 - 18

    3.     B. Benedict Waters v. Jones Day, Case No.
12-CV-04895 CAS   . . . . . . . . . . . . . . .   18 - 19

    4.     B. Benedict Waters v. Howard Sommers Towing, Inc.,
Case No. 10-cv-052956 CAS   . . . . . . . . . . . . .   19 - 24

             a.       An Orthodox Jew And The United States
Supreme Court   . . . . . . . . . . . . . . . .   20 - 23

             b.       An Orthodox Jew And A Day Off   . . . . . . . . .   23 24

Concluding Statement  . . . . . . . . . . . . . . . . . . . . . . . . . .   25

Supporting Declaration . . . . . . . . . . . . . . . . . . . . . . . . . .   26

# Table of Authorities

## Cases

***Burwell v. Hobby Lobby Stores, Inc.*** *(2014)*
    *573 U.S. _____* . . . . . . . . . . . . . . . . . . . . . . . . 2, 5, 25

***Goldman v. Weinberger*** *(1986)*
    *475 U.S. 503* . . . . . . . . . . . . . . . . . . . . . . 5

## Federal Statutes

10 U.S.C. § 774 . . . . . . . . . . . . . . . . . . . . . . 5
42 U. S. C. §2000bb . . . . . . . . . . . . . . . . . . . . 2, 5

## Federal Rules

Federal Rule of Civil Procedure 60(b) . . . . . . . . . . . . . . . . 15

## Local Rules

Local Rule 7-3 . . . . . . . . . . . . . . . . . . . . 2
Local Rule 7-19 . . . . . . . . . . . . . . . . . . . 23, 24

## State Statutes

California Vehicle Code § 22851(b) . . . . . . . . . . . . . . . . . 20

## Other Authority

Cutler, Allan Harris and Helen Elquist Cutler.  *The Jew as Ally of the Muslim: Medieval Roots of Anti-Semitism.*  Note Dame, Ind. University of Notre Dame Press. 1986 . . . . . . . . . . . . . . . 7

*De Regimine Judaecorum* . . . . . . . . . . . . . . . . . . . 6

Leonard Dinnerstein, Anti-Semitism in America. Oxford University Press. 1994 . . . . . . . . . . . . . . . . . 7

Nostra Aetate, the Declaration on the Relation of the Church with Non-Christian Religions, Part IV . . . . . . . . . . . . . . . 8

1    **PLEASE TAKE NOTICE**, and notice is hereby given, that Plaintiff *pro se*,

2    B. Benedict Waters, who, on 2014 September 08 at 10:00 AM, or as soon

3    thereafter as the matter may be heard, at Courtroom 5 of the above-entitled court,

4    will move, pursuant to **Burwell v. Hobby Lobby Stores, Inc**. (2014) 573 U.S.

5    _____ and the <u>Religious Freedom Restoration Act of 1993</u> for an order

6    transferring this case to a non-Jewish district judge.

7          Said motion will be made on the grounds that Plaintiff was born, baptized

8    and confirmed a Roman Catholic and instructed under its anti-Semitic views prior

9    to Vatican II and, after seven years in Courtroom 5 where Plaintiff has been

10   repeatedly verbally abused, insulted by, deliberately humiliated and ***had racist***

11   ***statements hurled at him in front of an all-white jury*** by Christine Ann

12   Snyder ("**Snyder**"), a Jew, as well as Every. Single. Jew. that has come into

13   contact with movant's cases has returned to his religious roots of what is now

14   considered Traditionalist Catholicism and further proceedings before **Snyder**

15   substantially burdens Plaintiff's Traditionalist Catholic views and will be based on

16   this notice of motion, this motion, the accompanying memorandum, the

17   concomitantly filed Supporting Declaration, and such other facts and law as may

18   be presented.

19   **Local Rule 7-3 Compliance**

20         This motion is made following the conference of counsel pursuant to L.R. 7-

21   3 which took place on 2014 July 09.

22   **Motion Period Re-Opened**

23         Motion cut-off was re-opened on 2013 October 07.

24                              Submitted —

25                              2014 August 02

26         By:

27                              B. Benedict Waters

28                              **Plaintiff**, *Pro Se*

PLAINTIFF'S MO TRANSFER TO NON-JEWISH JUDGE                    **Page 2**

# Memorandum of Points and Authorities

The conduct of Every. Single. Jew. who has come into contact with our statutory and federal civil rights cases over the past *seven* years has been horrific with the most egregious committed by **Snyder g** from her assertion of **time travel** to making racist comments against the black Plaintiff in front of an all-white jury.

Friedrich Spee von Langenfeld (Friedrich Spee), a priest who heard the confessions of condemned witches, and who wrote in 1631 the *Cautio Criminalis* ('Prudence in Criminal Cases'), a tome which, through sarcasm, he bitingly described the decision tree by judges for condemning accused witches:

> If the witch had led an evil and improper life, she was guilty; if she had led a good and proper life, this too was a proof, for witches dissemble and try to appear especially virtuous.
> After the woman was put in prison: if she was afraid, this proved her guilt; if she was not afraid, this proved her guilt, for witches characteristically pretend innocence and wear a bold front.
>
> Or on hearing of a denunciation of witchcraft against her, she might seek flight or remain; if she ran, that proved her guilt; if she remained, the devil had detained her so she could not get away.

The priest had Snyder in mind.  In one case, Snyder acted to bail out Defendant Hollywood Tow (ergo her Jewish colleague Gary Minzer) by insisting that a towing debt *was **not*** a transaction. Civil Minutes, Doc 276, pp. 10-11, *entered 2010 October 04*.  4 months and 12 days later, however, Snyder swung the other way to help her Jewish cohorts, now insisting that a towing debt *was* a transaction after all.  Civil Minutes, Doc 420, p. 4, entered 2011 February 16.

1    A complete listing of the acts by Jews in our cases that compelled Plaintiff

2  to return to his Traditionalist Catholic roots would fill several Bibles, bu a few:

3  •    **Snyder** made racist statements against the black Plaintiff in front of an all-

4       white jury while grinning like a 19th century Southern plantation owner.

5  •    **Snyder** has resisted even recognizing any apposite law or case authority

6       remotely favorable to the non-Jew in this litigation.

7  •    **Snyder** has schemed to render as much of our civil litigation against her

8       synagoguemate, Gary Minzer (aka Hollywood Tow), as "*moot*" as possible.

9  •    **Snyder,** to help her fellow Jews, has manufactured non-existent allegations

10      in our Complaints as a basis for then dismissing the same said Complaints.

11 •    **Snyder** has repeatedly accused Plaintiff of "*previously*" filing motions or

12      doing deeds that if true would have required functioning **time travel**.

13 •    **Snyder** has shifted the blame for incompetent filings from the Jewish law

14      firm that authored and filed the document to the black Plaintiff.

15 •    **Snyder,** working on behalf of her Jewish cohort blocked Plaintiff's

16      meaningful pretrial discovery.

17 •    **Snyder,** at a time when circuit law made it possible,  attempted to **trick**

18      Plaintiff to waiving appellate review of dismissed Claims against Jews.

19 •    **Snyder** routinely and repeatedly insults Plaintiff's intelligence with some of

20      the most ludicrous, blatant lies as cover for protecting Jewish interests.

21 •    **Snyder,**  granted the defense's Rule 50 motion while stating in front of

22      Plaintiff the motion was denied.

23 •    **Snyder,** made racist statements against the black Plaintiff in front of an all-

24      white jury while effecting a phony grandmotherly grin for effect.

25      The above summary is well-documented in our papers and appellate briefs.

26 We will sample a few of the more abhorrent behavior in support of this motion and

27 as foundation for the sincerity of Plaintiff's **current** beliefs after discussing

28 applicable legal standards.

# Statement of Law

1.   **The RFRA Is Applicable To All Branches Of The Federal Government**

The initial question, in our view, is whether the Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U. S. C. §2000bb *et seq*. is applicable to the federal courts.

The statutory language of *"RFRA's text shows that Congress designed the statute to provide very broad protection for religious liberty"*, <u>*infra*</u>, *at 3*, the absence of any express exemption, and the Supreme Court's recent decision in ***Burwell v. Hobby Lobby Stores, Inc.**, (2014) 573 U.S. ____, slip opinion (June 30, 2014)* ("**Hobby Lobby**") instructs that the RFRA prohibits the "***<u>Federal Government</u>** from taking any action that substantially burdens the exercise of religion unless that action constitutes the least restrictive means of serving a compelling government interest."  <u>*Slip op.*</u>, *at 2*.  (Emphasis ours.)

Here, Congress has exercised its power to wrap the exercise of religion with <u>statutory</u> protection greater than the Supreme Court's <u>constitutional</u> protection provided by Supreme Court case law.  It has the power to do so.  For example, in response to ***Goldman v. Weinberger** (1986) 475 U.S. 503*, Congress passed the <u>National Defense Authorization Act for Fiscal Years 1988/89</u>, 10 U.S.C. § 774 (providing that members of the military wars were entitled to wear religious headgear) which designedly overrode the ***Goldman*** decision.  *"Congress enacted RFRA in 1993 in order to provide very broad protection for religious liberty."*  **Hobby Lobby**, *slip op., at 4*.  *"[P]ractices compelled or limited by the tenets of **a religious doctrine** fall comfortably within the understanding of the 'exercise of religion' . . . ."*  <u>*Ibid*</u>.

/ / /

/ / /

/ / /

/ / /

# Statement of Fact

**"Fucking Jews!"**

So began Mel Gibson's now infamous anti-Semitic rant to Los Angeles County deputy sheriff James Mee who pulled Gibson over, in Malibu, California, on suspicion of drunken driving 2006 July. *"The Jews are responsible for all the wars in the world,"* the world-famous movie actor continued, before asking deputy Mee: *"Are you a Jew?"*

What is notable and relevant here is the media focused on the anti-Semitic aspect of Gibson's remarks with little or no mention of the fact Gibson is a traditionalist Roman Catholic whose tenets hold, in a historically correct context, that Jews are *responsible* for the crucifixion of Jesus Christ. [1]

Traditionalist Roman Catholic tenets also underpin this motion.

Saint John Chrysostom, an archbishop of Constantinople, was an important, polarizing influence in the Catholic Churches in the 4th Century, having wide appeal in the Orthodox, Eastern as well as Roman Catholic Churches and the Coptic Orthodox Church. He, in eight sermons, virulently denounced not only Jews but those Christians who **associated** with Jews and especially those Christians who assimilated Jewish traditions.

Saint Thomas Aquinas, a preeminent Roman Catholic theologian and philosopher of the High Middle Ages, wrote in his 1270 dissertation *De Regimine Judaecorum* that Jews should be compelled to wear a badge marking them readily distinguishable to Christians, and advocated relegating Jews to the level of *"slaves"*.

/ / /

---

[1] This is a simplification; the full chain of events, involving two branches of Judaism, Orthodox and Hellenized, and enough machinations over several decades, different empires and kingdoms with an amazing and Byzantine Game of Thrones for the seat of the High Priest of Jerusalem by concatenated murders of brother killing his Jewish brother, starting with the Maccabees and 2nd Century BC Judea, is well beyond the scope of this paper.

1    During the Medieval Period, anti-Semitism amongst Catholics sprang from
2    the fact, surprising when viewed through today's lens, that Jews were seen as and
3    were in fact allies of Muslims, who in turn were enemies of Catholics.

4    Muslims occupied a region stretching from Morocco to Egypt to Turkey to
5    Siberia, geographically surrounding Christiandom.  Muslims were a constant
6    enemy and, indeed, every military threat after the tenth century against European
7    Catholics came from Muslims.   Even more shocking in the context of current
8    events, Jews themselves associated Jew with Muslim.  See Cutler, Allan Harris
9    and Helen Elquist Cutler.  *The Jew as Ally of the Muslim: Medieval Roots of*
10   *Anti-Semitism.*  Note Dame, Ind. University of Notre Dame Press. 1986.   When
11   this became known among Catholics, it much harmed the Jews' position.  Most
12   damaging of all, Jews on occasion helped Muslim troops against Catholics (as in
13   the initial Arab conquest of Spain) and some Jews held prominent positions in
14   Muslim governments at war with the Christians.  Even when they did not actually
15   take part in the fighting, "*Jews usually rejoiced when Christian territory fell*
16   *into Islamic hands.*"  *Id.*

17   Moving forward in time.

18   "*From the end of the Civil War until the beginning of the twentieth*
19   *century, the United States witnessed the emergence of a full-fledged*
20   *antisemitic society.*"  "*Having been thoroughly indoctrinated as children, and*
21   *having absorbed conventional attitudes simply by living in the United States*
22   *that this country was, and of right ought to be, a Christian nation.  They hold*
23   *to **traditional** views of Jews as Christ-killers who remained obstinate in their*
24   *determination not to accept the truthfulness of Christian teachings; as*
25   ***dishonest** businessman always out for material gain; and as strange, crass and*
26   *aloof individuals who insisted on **standing apart from the community** in which*
27   *they lived.*"  Leonard Dinnerstein, <u>Anti-Semitism in America</u>.  Oxford University
28   Press. 1994. (Emphasis added.)

1    At the beginning of the twentieth century, Dietrich Bonhoeffer, a Lutheran
2 theologian, began preaching that a Church is not a church absent an obligation to
3 all, even those outside it.  His novel teachings were that Christianity must embrace
4 non-Christians including Jews.  Bonhoeffer, a German, sacrificed tremendously
5 aiding Jews escape from horrendous Nazi persecution until his own capture and
6 imprisonment at the Buchenwald concentration camp.  He was executed by the
7 Nazis on 1945 April 09.

8    His influence did not die with him.  In 1962, the Roman Catholic Church
9 convened Vatican II (the Second Vatican Council).  It was a watershed
10 reformation in many aspects of Catholic liturgy and roils the church to this date.
11 Vatican II issued three declarations.  One is germane to our debate; Nostra Aetate.

12    <u>Nostra Aetate, the Declaration on the Relation of the Church with Non-</u>
13 <u>Christian Religions, Part IV</u>, while retaining the premise that "*some*" Jews and
14 "*some*" Jewish authorities advocated for the death of Jesus Christ, rejected
15 wholeheartedly the universal charge of deicide against all Jews, totally repudiating
16 all forms of anti-Semitism by anyone from the beginning of time to the end of the
17 world.  Not every Catholic was amused by this.

18    Traditional Catholic movements were awaken, reborn and came into being
19 in response.  St. Joseph Forum, a private Catholic organization announced its
20 Project Awaken.  SJF espoused a belief that "*the restoration of the Church will*
21 *begin only when a sufficient number of priests and bishops return to Catholic*
22 *orthodoxy, and we know of no other writings which are more likely to bring*
23 *this about than those of **Fr. Denis Fahey** (1883-1954), priest of the*
24 *Congregation of the Holy Spirit.*" http://www.stjosephforum.org/projectawa-
25 ken.html (July 2014). (Emphasis added.)

26    SJF continued, "*We do not hesitate to say that if the English-speaking*
27 *clergy at the Second Vatican Council had read Fr. Fahey, the Naturalistic*
28 *Revolution which was set in motion there would never have occurred.*" *Id*.

1      Fr. Fahey writes: "*They thus inevitably come under the leadership of the*

2  *Jews, who wield such enormous power in the modern world through the*

3  *subjection of man to production and of production to finance.*"  Ibid.

4      Father Denis Fahey believed that "*every sane thinker must be an*

5  *anti-Semite.*"  Although Father Fahey died in 1954 his influence remains strong

6  amongst traditionalist Roman Catholics.  Fr. Fahey is the main source for *The Plot*

7  *Against the Church*, a 1967 book that like the *Protocols of the Elders of Zion*

8  blames Jews, also referred to as the "*synagogue of Satan*," for every evil that has

9  befallen Catholics from Roman times to the present.  History accords with this.

10      Although Mel Gibson seemly concurs with that theology, less radical

11  traditionalist Catholics, including the Society of St. Pius X the might and main of

12  Traditionalists, a communion that has millions of congregants, continue to claim

13  they are not anti-Semitic, just against "*Jewish naturalism.*"

14      We have moved from 200 BC to the modern era in great leaps as a more

15  tightly-progressed continuum is impossible to express in 25 pages and would add

16  little to the fact there exists a religious doctrine amongst traditionalist Roman

17  Catholics that preaches Jews "*as **dishonest** businessman always out for*

18  *material gain; and as strange, crass and aloof individuals who insisted on*

19  ***standing apart from the community***, and real Catholics should not and may not

20  interact with Jews to any degree or be judged a sinner and not a "*sane thinker.*"

21  

## Discussion

22      We have shown how traditional Catholicism was and is adverse to Judaism;

23  traditional Catholicism believers hold that association with Jews is sinful and a

24  path to moral decay.  Moreover, traditional Catholics deem Jews dishonest and

25  dismissive of any non-Jewish laws or non-Jewish interests.  Plaintiff was raised a

26  traditional Roman Catholic and his mistreatment and abuse and the rain of insults

27  by Every. Single. Jew. coming in contact with this case, particularly **Snyder** has

28  driven him back to his traditional Catholic religion.

1    It would fill several Bibles to list every agonizing transgression committed

2  against Plaintiff by the Jews in the following four cases.  We limit ourselves as

3  much as possible to only professional and judicial mis- and criminal conduct to

4  avoid the appearance of being a just another litigant complaining about unfavor-

5  able rulings, and to avoid diverting from the Jewish issue spawned by Jews, Every.

6  Single. Jew. that came into contact with this case.

7

8  1.   **B. Benedict Waters v. Hollywood Tow Service, Inc., et al., Case No.**

9       **07-cv-07568 CAS** ("the 2007 Case")

10    All references to docket numbers ("DN") in this Part refer to the docket of

11  *B. Benedict Waters v. Hollywood Tow Service, Inc.*, Case No. 07-cv-07568.

12    A Jewish suspect viciously assaults a woman at a gas station.  The assault is

13  witness by several people, one of whom takes a photograph of the suspect.  DNA

14  is obtained from the crime scene.  The eyewitness identification, the photograph

15  and the DNA all match the suspect.  Detectives arrest the guy and bring him to

16  trial.  **Snyder** would dismiss the Jew, claiming the charges against him are just

17  "*speculation*".

18    Now flip it.

19    Plaintiff, in effect, sued **Snyder**'s Jewish synagogue-mate Gary Minzer (by

20  suing Hollywood Tow Service, Inc. solely owned by Minzer) for seizing

21  Plaintiff's car under color of state authority and in violation of the Fourth

22  Amendment.

23    Here are the facts.  Plaintiff parked his car one-foot behind a Sign regulating

24  street parking.  Plaintiff parked on a **Saturday** night.  A posted **Sign** prohibited

25  parking on **Tuesday** mornings for street cleaning.  HT seized and impounded

26  Plaintiff's car, alleging Plaintiff's car was parked in violation of the posted Sign

27  and further alleged the **Sign** prohibited parking on that Saturday night.  Astonish-

28  ingly, a **Photograph** was taken at the time by HT's co-defendant Montoya.

PLAINTIFF'S MO TRANSFER TO NON-JEWISH JUDGE                    **Page 10**

1   The **Photograph** shows Plaintiff's car parked behind the single **Sign**, which

2   prohibited parking ***only*** on Tuesday mornings for street cleaning.

3   Plaintiff feverishly disputed the ticket, demanding an administrative

4   hearing.  The defendants refused to produce the **Photograph**, removing it from the

5   administrative file before the hearing – resulting in a ruling against Plaintiff.

6   Plaintiff appealed for a trial *de novo* before the California Superior Court.

7   The Superior Court ordered the entire file, *including* the **Photograph**, transferred

8   to it for the court trial.  Defendants disobeyed the court order, again suppressing

9   the **Photograph**.  The Superior Court, following bench trial, reversed the

10  administrative judgment.

11  Plaintiff next requested a copy of the Photograph under Defendant City of

12  Los Angeles' Administrative Code, Division 12, Records, Chapter  2, Article 2, §

13  12.30.  Defendants resisted their own municipal law, again refusing to release a

14  copy of the **Photograph**.

15  Plaintiff followed that with a request for a copy of the **Photograph** under

16  California's Public Records Act, California Government Code, § 6250 et seq.

17  Defendants now ignored state law; refusing to release a copy of the **Photograph**.

18  The Case 2007 was filed.  Defendants pitched a sham negative of what they

19  purported was that of the **Photograph** at Plaintiff.  That failed.  Plaintiff repeated

20  his demand for a copy of the **Photograph**.   Defendants continued stonewalling.

21  Plaintiff, the individual who had parked his car, an **eyewitness** to the **Sign**

22  as well as having personally seen and reviewed the **Photograph**, and after having

23  tried and triumphed in the Superior Court at bench trial, thoroughly averred in his

24  Complaint in the 2007 Case that he had been legally parked on that **Saturday**.  **DN**

25  **226**; *p. 24, pp.  14-19, and <u>Fourth Claim</u>, pp. 52-57.*

26  The Jews simply argued:  *"Plaintiff was well aware of the 'no parking'*

27  *restriction at the subject location since he observed the sign being installed*

28  *days before the "subject citation and impoundment."*  **DN 233**; 19:25-27.

PLAINTIFF'S MO TRANSFER TO NON-JEWISH JUDGE                                      **Page 11**

1  That's it.  One sentence.

2  **Snyder** then gratuitously attacked Plaintiff's averments as "*speculation*."

3  What jumps out is that **Snyder** totally leapfrogged over the unlawful acts of

4  her fellow Jews in hiding the **Photograph**.  Had the **Photograph** shown Plaintiff's

5  car illegally parked, the Jews would have waived it like a flag.  Instead, the Jews'

6  conduct, specifically including Snyder, [2/] broke law after law after law to **conceal**

7  damaging evidence in their possession while hissing their make-believe innocence

8  was consistent with the view of traditionalist Catholics that Jews are genetically

9  dishonest and only respect the laws of their Jewish community.

10  Traditional Catholics hold the view that Jews have no respect for the rule of

11  law or any law not their own.  See *mesira*.

12

13  2.  **B. Benedict Waters v. Juan Carlos Casas, et al., Case No. 09−cv−**

14  **07696 CAS** ("the 2009 Case")

15  All references to docket numbers ("DN") in this Part refer to the docket of

16  *B. Benedict Waters v. Juan Carlos Casas, Case No. 09-cv-07696;* **2009 Case.**

17  A Complaint was filed and Summons issued in the 2009 Case.  Plaintiff, in

18  obedience to the law, effected service of summons and complaint on Defendants

19  Juan Carlos Casas ("Casas") and Rickenbacker Group ("RG") by independent

20  California-registered process servers.  The chronology as to Casas and RG is as

21  follows.

22

23  a.  **Jews Actions And Criminal Conduct Regarding Casas' Default**

24  **Made A Mockery Of American Justice System**

25  2010 February 04 - Defendant Casas ("**Casas**") served with summons and

26  complaint, **DN 18**, by California registered process server.  No response.

27

28  ───────────────────

[2/] **Snyder** resisted enforcing Plaintiff's above Public Records Act.  *Ante*.

1    2010 February 18, RG served with summons and complaint, **DN 16**, by

2    California registered process server.   No response.

3    2010 March 16 - Plaintiff requested **Casas'** default.  **DN 14, DN 15.**

4    2010 March 19 - Plaintiff requested **RG's** default.  **DN 17.**

5    2010 March 22 - Clerk defaulted **Casas**.  **DN 19.**

6    2010 March 26 -, Plaintiff requested **Robinson's** default.  **DN 26.**

7    2010 April 02 - Clerk defaulted **Robinson**.  **DN 29.**

8    2010 April 02, Clerk defaulted **RG**.  **DN 31.**

9    2010 April 23, **Casas** and **RG** moved to vacate their defaults.  **DN 43**[3/]

10   2010 May 27 - **Casas'** and **RG's** defaults vacated.  Order, **DN 67.**

11   2010 July 19 - Plaintiff moved for reconsideration.  **DN 113.**

12   2010 August 20 - Denied, **Snyder**, J. indicating another refusal to read our

13   papers.  "*The Court finds that plaintiff's motion does not present any new*

14   *factual or legal arguments . . . .*"  Order, **DN 186, at 5, ¶ 3.**[4/]  The text of the

15   denial reveals Snyder was unaware Plaintiff never made *previous* argument.

16   The Jewish law firm, **Liedle, Lounsbery, Larson & Lidl, LLP**, in asking

17   **Snyder** to toss out Casas' default, **DN 43**, insisted that:

18   (**1**) Plaintiff himself **personally** tried to serve the Summons and Complaint,

19   (**2**) that the Summons attempted to be served had been **blank** and

20   (**3**) the Jewish law firm filed the sworn declaration of Stacy Angst, a Jewish

21   employee of Casas, who averred that Plaintiff had just dropped off the Summons

22   and Complaint at an empty desk and left.  **DN 43, DN 43-1** and **DN 43-2**, *passim*.

---

23   [3/] Plaintiff was never served with the motion and thus never filed Opposition.

24   Defendants' lawyers did **not** comply with **pre-filing** requirements (L.R. 7-3), **DN 113**,
     and did not serve a copy of the motion on Plaintiff.  *Id*.  Snyder's statement that we did

25   not present "*new*" arguments conclusively shows yet again not only that Snyder, the
     Jewish judge, does not bother to read the black Plaintiff's papers but then makes false

26   statements to suggest that she has; reprehensible behavior.

27   [4/] As noted in Motion for Reconsideration, Plaintiff had not presented any '**old**'

28   factual or legal arguments; Plaintiff never receiving original motion to vacate default had
     not presented facts or arguments in the first instance.

PLAINTIFF'S MO TRANSFER TO NON-JEWISH JUDGE                     **Page 13**

1    The Jewish law firm lied in several respects.  **Snyder** was okay with that.

2    Plaintiff did **not** attempt to personally serve the summons and complaint on

3    Casas.  **DN 113** *at 35-36*, ¶¶ *10-11*.  Plaintiff hired an independent professional

4    process service company, Bender's Legal Services.  *Id., at p. 35, ¶ 10*.

5    Plaintiff produced the receipt from the process service company, **DN 113**, *p.*

6    *50*, as well as the declarations of the two employees (Robert T. Dillon and

7    Kenneth Smith, respectively) of Bender's Legal Services who has actually effected

8    combination service on Casas, **DN 113**, *pp. 41-44* and **DN 113**, *pp. 46-48*, served

9    and filed Bender's declaration that the Summons as served had not been blank,

10   **DN 113**, *at 43:11-13*, attaching a true copy of the Summons (properly filled out)

11   that had been served.  **DN 113-1**, *p. 41*.

12   What is noteworthy is how comfortable the Jewish law firm was at being

13   dishonest, like breathing or drinking water; reasonably validating the doctrine of

14   traditionalist Catholic re Jews.

15

16        b.        **The Jewish Law Firm Procured a Jew to Commit Perjury**

17   The Jewish law firm, **Liedle, Lounsbery, Larson & Lidl, LLP**, in asking

18   **Snyder** to toss out Casas' default, **DN 43**, prepared and has a Jewish employee of

19   Casas, one Stacey Angst ("Angst") swear under oath that the Summons and

20   Complaint had just been dropped off at an empty desk at the office of RG to be

21   discovered later.  See Angst Decl., **DN 43-2**, *p. 2, line 4*.

22   In response to Angst's sworn statement that the Summons and Complaint

23   had just been dropped off at an empty desk at the office of RG, we served and

24   filed a true copy of the receipt **signed** by Ms. Tara Bevington, Casas' **vice**

25   **president** who had personally accepted in her hand the Summons and Complaint

26   on the day it was served at the office of RG.  **DN 113-1**, *p. 39*.

27   The casual dishonesty of the Jewish law firm is blazingly impressive.

28   Equally so, the fact **Snyder** was perfectly okay with it.

c.   **Snyder's Dumping Of Rickenbacker Group's Default Was Prototypical Jewish Disregard For Non-Jewish Law**

RG was served by independent California-registered process server separate from that of Casas.  Like Casas, RG did not respond to service and its default was entered.  Subsequently, the Jewish law firm, **Liedle, Lounsbery, Larson & Lidl, LLP**, asked Snyder to dump RG's default along with that of Casas.  **DN 43**.

However, in asking, the Jewish law firm barely mentions RG, providing no evidence, facts or legal argument as to why RG's default should dumped.  See **DN 43**, *passim*.  Under Federal Rule of Civil Procedure 60(b), a default may be set aside for mistake, inadvertence, surprise or excusable neglect.  The Jewish law firm made no effort to show RG committed a mistake, acted inadvertently, was surprised or was excusably negligent.  Nothing.  Snyder threw out RG's default anyway—doing the Jewish law firm a favor.  The record of the 2009 Case hardly contradicts this, please see **DN 43**, *passim*, but fully supports the instant traditionalist Catholic doctrine.

d.   **Snyder's Wiping Out Robinson's Default Accents Traditionalist Catholic Doctrine re Jews — Unless The Rules of Quantum Physics Are Null And Void**

A Complaint was filed and Summons issued in the 2009 Case.  Plaintiff, in obedience to the law, effected service of summons and complaint on Defendant Rita Robinson ("Robinson") by independent California-registered process server.  The relevant and critical chronology as to Robinson is as follows.

2010 February 17 - Robinson served with summons and complaint, **DN 25, pp. 3-4**, by registered process server.  No  response. [5]

2010 April 26 - "*Discovery Cut-off*" set for 2010 August 06; "*Last Day to File Motions*" for 2010 August 13, Trial for 2010 November 16.  **DN 51**.

---

[5] Combination service. California Code Civ. Proc., § 415.20(b); *Khourie, Crew & Jaeger v. Salek, Inc.* (1990) 220 Cal.App.3d 1009, 1013 - 1014.

2010 September 27 - <u>over seven months **after** being served</u>, 52 days **after** discovery cut-off, 45 days **after** motion cut-off and <u>six weeks **before** trial</u>, **Robinson** moved to vacate default.  **DN 255.**

2010 October 25 - date **Robinson** set for her motion.  **DN 255.**

2010 October 04 - <u>before</u> Plaintiff's Opposition was filed, **Snyder**, J. rushed vacating Robinson's default.  <u>One-sentence</u>: *"Upon the Court's <u>review of</u>* *<u>defendant's motion</u>, the Court hereby GRANTS defendant Rita Robinson's* *Motion to Set Aside Default **<u>forthwith</u>**."*  Order, **DN 273.**

On 2010 October 04, **Robinson** awarded summary judgment *sua sponte*. No notice.  **DN 276**, *12:13-14.*

<u>One sentence</u>. No notice.  **DN 276**, *12:17-18.*

2010 October 04 - per <u>Local Rule 7-9</u> - Plaintiff's Opposition to the request to set aside Robinson's default was due and required to be filed **2010 October 04**.

2010 October 04 - Plaintiff, unaware default already vacated and summary judgment already granted Robinson, filed his Opposition, **DN 278**, at the *pro se* filing window on the afternoon of **2010 October 04** at 3:59 PM.  **DN 278**, *p. 1.*

Robinson's default was thrown out and she was gifted with *summary* judgment without Plaintiff's opposition to relieving Robinson of default having even made its way up to Courtroom 5.  Snyder, a Jew, handled these matters in a manner weirdly mimicking Roland Freisler, an opprobrious Nazi lawyer and judge who conducted show trials more elaborate but similar to Snyder's Jewish display of *justice* re Robinson's spontaneous default reversal and miraculous judgment.

Robinson was represented by Gabriel Seth Dermer who self-identified himself to **Snyder** as an Orthodox Jew and apparently a quantum physicist.  Mr. Dermer was even more creative, but equally dishonest, as the Jewish law firm representing Casas.  Mr. Dermer prepared and had his client, Rita Robinson sign a **declaration under oath and penalty of perjury that the process served had never been to her office on 2010 February 17 or ever**.

1    On the other hand, the process server signed a declaration that he had been

2    in Robinson's office on 2010 February 17.  Someone is being dishonest.

3    Obviously, under the known laws of quantum physics matter cannot exist in

4    two places simultaneously—stated another way matter cannot be in a place and

5    not be in a place simultaneously.

6    Yet, for the process server, Mr. Edwards to have **not** been in Robinson's

7    office on 2010 February 17, Edwards would have had to have been in Robinson's

8    office on February 17 and simultaneously not been in Robinson's office on

9    February 17.  However, this would violate the laws of nature.

10    Or perjury.

11    Dermer had Robinson admit, under oath and penalty of perjury, that the

12    same process server, Al Edwards, did serve her with Summons and Complaint in

13    the related case, the **2007 Case**.  See Robinson Decl., **DN 255-1** *at ¶ 8* ("*For*

14    *instance, **I was served**, and responded to, the summons in Waters v.*

15    *Hollywood Tow Service et al., Case No. 07-7568.*")

16    **Where** did the process server effect service of the 2007 Case?  Robinson's

17    office.  See <u>Proof of Service</u> on Defendant Rita L. Robinson, *Doc 321,* filed 2010

18    March 26 in *Waters v. Hollywood Tow, et al,* 07-cv-07568).

19    **When** did the process server effect service of the 2007 Case at Robinson's

20    office?  On 2010 February 17.  See <u>Proof of Service</u> on Defendant Rita L.

21    Robinson, *Doc 321,* filed 2010 March 26 in *Waters v. Hollywood Tow, et al,* 07-

22    cv-07568).

23    Finally, Robinson did respond to service of process in the 2007 Case; which

24    service occurred at her office on 2010 February 17.

25    Yet, in support of her efforts to get out of default, Mr. Dermer, an Orthodox

26    Jew, prepared and Robinson signed a sworn statement that the process server, Al

27    Edward had NEVER ever been to her office.  At all.  Including not on 2010

28    February 17.

1   So, what happened?  Gabriel Dermer, an avowed Orthodox Jew, in

2   suborning Robinson to perjury, conduct compatible with traditionalist Catholic

3   doctrine on Jews, did not check and more likely did not even think of the Proof of

4   Service in the 2007 Case; that it would reveal the process server as having been in

5   Robinson's office after all on 2010 February 17.

6   Finally, all though the record suggests that **Snyder** was 'unaware' of

7   Dermer's dishonesty we do not believe in coincidences.  Nothing explains

8   **Snyder's** rush to throw out Robinson's default and simultaneously grant her

9   summary judgment but for the fact **Snyder** wanted to avoid the appearance of

10  knowing the above facts.  **Snyder** knew.

11

12  3.   **B. Benedict Waters v. Jones Day, Case No. 12-CV-04895 CAS**

13  Paul Joseph Goebbels, whom bears a striking resemblance to **Snyder**, was

14  the Minister of Public Enlightenment and Propaganda for the Third Reich,

15  operated in a strikingly similar manner to **Snyder**.  "*If you tell a lie big enough*

16  *and keep repeating it, people will eventually come to believe it. The lie can be*

17  *maintained only for such time as the State can shield the people from the*

18  *political, economic and/or military consequences of the lie. It thus becomes*

19  *vitally important for the State to use all of its powers to repress dissent, for*

20  *the truth is the mortal enemy of the lie, and thus by extension, the truth is the*

21  *greatest enemy of the State.*"  Joseph Goebbels

22  http://thinkexist.com/quotation/-if_you_tell_a_lie_big_enough_and_keep_repeatin

23  g/345877.html (July 2014).

24  Part of **Snyder**'s gamesmanship is misinformation repeatedly and of every

25  stripe accusing the black Plaintiff of some amorphous wrong, some vague

26  indiscretion without articulating any independently verifiable facts; a basic tenet

27  of propaganda.

28  / / /

PLAINTIFF'S MO TRANSFER TO NON-JEWISH JUDGE                          **Page 18**

1    She consistently makes false statements whose sole purpose is to portray the

2  black Plaintiff in a negative light.  While ignoring the unethical, illegal conduct of

3  her Jewish colleagues, **Snyder** seldom misses an opportunity to cast aspersions on

4  the Plaintiff.

5    Not once, not one time, see above, has **Snyder** ever made a negative

6  comment about her fellow Jews.

7    In this case, **Snyder** stated that "*Plaintiff's oppositions to these motions*

8  *were filed improperly . . . .*" <u>Civil Minutes</u>, Doc 79 at 2, fn 1.  False.  And note

9  that Snyder conveniently does not explain her derogation or where in the record

10  can be found support.  Her routine.

11    Plaintiff's motions were filed by order of United States District Judge

12  Anthony J. Battaglia.  See <u>Civil Minutes</u>, **DN 58**.  The Jewish judge does not

13  describe just what she means or how the motions were filed improperly.  This is

14  part of **Snyder**'s propaganda tactics, to throw raw conclusory stones then move on

15  without any explication.

16

17  4.    **B. Benedict Waters v. Howard Sommers Towing, Inc., Case No. 10-cv-**

18        **052956 CAS**

19    **Snyder** declared Plaintiff a vexatious litigant.  We decline here to shred the

20  manufactured basis for that ruling.  We note, however, the ulterior purpose was to

21  deny Plaintiff information prior to trial as well as prevent a fair trial.  With the

22  vexatious litigant ruling, **Snyder** was thus able to inconspicuously reject

23  Plaintiff's attempts to compel discovery, to avoid barring introduction at trial by

24  her Jewish fellows of improperly withheld information and, most significantly, to

25  dodge ruling that the defendant cop was precluded from denying the traffic stop

26  was the result of racial profiling.

27  / / /

28  / / /

PLAINTIFF'S MO TRANSFER TO NON-JEWISH JUDGE                **Page 19**

1   Had **Snyder** selectively ignored some motions while considering others it

2   would have been obvious what she was up to.  With the vexatious litigant ruling as

3   a cover, **Snyder** could just reject everything, including discovery motions and the

4   motion in limine re racial profiling and it would just seem to be part of her overall

5   universal rejection pattern.  And that is what happened, **Snyder** conveniently and

6   mysteriously rejected everything Plaintiff attempted to file **before** the trial -

7   including eight discovery motions, two summary judgment motions [6/], and our

8   supercritical motions *in limine*.

9

10  a.   **An Orthodox Jew And The United States Supreme Court**

11  California law, as stated above, does not permit a tow truck company to

12  impound personal property when it seizes a car.  See Cal. VC § 22851(b).  Any

13  property in the vehicle when seized must be immediately released to the owner

14  upon demand.  *Id*.

15  After Hollywood Tow impounded Plaintiff's car on 2008 November 24,

16  Plaintiff traveled to Hollywood Tow to retrieve his personal property, including

17  his car keys per § 22851(b).

18  Hollywood Tow, acting under color of state authority,  requires a driver's

19  license be presented as a condition of allowing access to its impound yard.  The

20  driver's license is retained by Hollywood Tow for the duration of the visit by the

21  car owner.  Plaintiff thus *temporarily* relinquished his driver's license in order to

22  gain access to the impound lot and retrieve his personal property from his

23  impounded car.  Once at his car, Plaintiff retrieved, amongst other things, his car

24  keys.

25  _____

26  [6/] Two summary judgment motions but the first one was accepted for filing.  We
    believe this was accidental because once **Snyder** realized her mistake she then sua sponte

27  denied the motion by pretending that Plaintiff had failed to file a Proposed Order.  A
    Proposed Order had been lodged.  It was and is listed on the Docket.  Politicians, at least

28  the crooked ones, call Snyder's action here as manufacturing *plausible deniability*.

PLAINTIFF'S MO TRANSFER TO NON-JEWISH JUDGE                    **Page 20**

Hollywood Tow wanted to keep Plaintiff's personal property, Plaintiff's car keys, because HT obtained more at auction for a car sold with keys.  Plaintiff refused to relinquish his personal property – his keys – and Hollywood Tow then acting under color of state authority refused to return Plaintiff's driver's license.

The Fourth Amendment protects unreasonable seizure of documents by state actors.  We sued Hollywood Tow via § 1983 for violating Plaintiff's Fourth Amendment right when it seized Plaintiff's driver's license under color of state authority.

Gabriel Seth Dermer, who it is pertinent to remind is an Orthodox Jew, moved to dismiss.  Mr. Dermer, the Orthodox Jew, insisted of Hollywood Tow's conduct that, "*This cannot rise to the level of a Fourth Amendment violation or Section 1983 claim as no unlawful seizure occurred.*"  **DN 89-1**, *at 10:6-7.*

It is unethical for a lawyer to misrepresent a decision by an appeals court.  Here, the Orthodox Jew represented that the Ninth Circuit decided in "*United States v. Nasser, 479 F.3d 1166, 1166-70 (9th Cir. 2007) (Fourth Amendment does not protect people against voluntary actions; it protects against "seizures" by the government).*"  *Id.*, *at 10:8-10.*  Dermer misrepresented the decision by the appeals court.  **Nasser** had absolutely nothing to do with a seizure of property.  Revelations do not stop there.

It is also unethical for a lawyer to seek to mislead a court.  But Dermer is an Orthodox Jew.  Dermer says that Plaintiff's "*license that had been voluntarily given to*" to Hollywood Tow.  This argument is repulsive and speaks to the arrogance of Jews.  How so?

Carrying Dermer's logic to its logical end, whenever you give a parking valet your keys you–according to Dermer–are giving him your car to keep.  Whenever you hand over your driver's license to a bank teller you are giving the bank your license to keep.  Whenever you mail in your original birth certificate to apply for a passport, you are giving the government your document to keep.

PLAINTIFF'S MO TRANSFER TO NON-JEWISH JUDGE                    **Page 21**

We could go on.  But anyone with a room temperature IQ and a Sixth Grade education can readily see Dermer's argument as nutty.

Snyder, the Jewish judge, then chimed in with argument just as foolish.  Snyder said that "*Additionally, when an individual __consents__ to relinquish his person or property, there is no Fourth Amendment 'seizure'.*"  Civil Minutes, **Doc 97**, *filed 2011 June 30, pp. 11-12*.  Snyder, apparently competing with Dermer to see who can reference the more useless case, points to "*United States v. Mendenhall, 446 U.S. 544 (1980)*".  Civil Minutes, **Doc 97**, *at 12*.  But **Mendenhall** has nothing to do with property seizure, either.

When a child tells you a lie that is easily pierced, you understand that it comes from a child's mind.  When an adult tells you a lie that is easily crushed, you understand that it comes from a lack of character.      Traditionalist Catholics understand a transparent lie from a Jew as a ethnic function.

Here, the Jewish lawyer and the Jewish judge both take the position that Plaintiff "*gave*" his driver's license to the tow truck company.  The inanity of their position supports traditionalist Catholic views of Jews.  It is inconceivable, beyond the realm of possibility that both a deputy city attorney and a federal district judge were and are unaware of bailment.

For the reader, we have pointed to several examples of bailment; giving your car key to a parking valet, giving a bank teller your driver's license, sending personal identifiers to a government agency for a passport—all subsumed by bailment.  Handing over your driver's license temporarily to gain access to an impound yard to recover personal property from your impounded car is bailment.

A bailment is the **temporary** placement of control over, or possession of personal property by one person, **the bailor**, into the hands of another, **the bailee**, for a designated purpose upon which the parties have agreed.

Handing someone your driver's license for an agreed-upon purpose, transfers "*possession*" temporarily but not dominion or ownership.

None of which involves the mathematics of a Einstein–Rosen bridge; although some of Snyder's statements suggest she has a working model.  The average person may not know *bailment* by name, they readily grasp the every day principles.  The Jewish lawyer and the Jewish judge's arguments about "*giving*" the driver's license away, and "*consenting to relinquishing*" the driver's license is not only disrespectful of the law, not only blindingly moronic on its face but a slap in the face by its insulting, blatant dishonesty.  This underscores traditionalist Catholic doctrine that Jews are dishonest.

### b.    **An Orthodox Jew And A Day Off**

Gabriel Seth Dermer wanted another continuance for a hearing he had already had continued by ex parte application to 2013 April 01 because the new hearing date, he had obtained, was "*during the holiday of Passover.*"  **DN 214**, *at 2:3*.  So, Dermer filed another Ex Parte Application for a continuance. [2/] Dermer, the Orthodox Jew, represented that (1) he had given notice of the application by telephone to Plaintiff, **DN 214**, *at 2:9-11*, and that (2) Plaintiff did "*not oppose the requested continuance.*"  **DN 214**, *at 3:21-22.*

Mr. Dermer was quite specific: He represented he had complied with "*Local Rule 7-19*".  **DN 214**, *at 2:6*.  He assured he "*has communicated the ground for the requested continuance with Plaintiff, who has not indicated any intention to oppose this ex parte application.*"  **DN 214**, *at 2:7-8.*

Dermer swore —**under oath and penalty of perjury**—that "*On March 15, 2013, **Soledad Figueroa**, my assistant, left a voicemail message for Plaintiff regarding the instant anticipated ex parte application to request a continu- ance of the Pretrial Conference/Motions in Limine Hearing as a  result of April 1conflicting with **my** observance of the Passover holiday.*"  **DN 214**, *at 5,* ¶ 2.

---

[2/] This came **two weeks** after his previous *successful* ex parte application, **DN 211**, to continue the Pre-Trial Conference to 2013 April 01.

PLAINTIFF'S MO TRANSFER TO NON-JEWISH JUDGE                    **Page 23**

1   Alright, keeping in mind that the players on the other side are Jewish, one
2   who has announced he is an Orthodox Jew, let's recap.

3   Mr. Dermer said he gave notice.  No notice given until 2019 March 19 via
4   **mail**—the **same day** the application was filed.  **DN 214**, *p. 6.*

5   Mr. Dermer said he complied with Local Rule 7-9.  Also not true.  Local
6   Rule 7-9 requires notice **in advance**.  See Local Rule 7-9.  Here, notice was by
7   mail on the same day of filing.  **DN 214**, *p. 6.*

8   Mr. Dermer said, under oath, his secretary left a voicemail *message for*
9   *Plaintiff regarding the instant anticipated ex parte application to request a*
10  *continuance.*  Again, **not** true.  A copy of the recorded message on CD was filed.
11  **DN 222.**  A transcript of the recording was filed.  **DN 223**, *at 6.*  Dermer's
12  secretary, ***Soledad Figueroa***, on 2013 March 15, said the following:

13

14      "*Urn, however, urn, there will be are-, another conti- another*
15      *request continuing this, thuh, this hearing.*"

16

17  The secretary said she did **not** have any other information.  *Id., , at 6.*

18

19  Mr. Dermer, this **"Orthodox Jew"** perjured himself because he wanted a day
20  off.  There is no way to sugarcoat it.  He did not as he could not challenge the
21  recording or the transcript of the recording of his secretary's actual message.

22  Moreover, although Dermer was correct that Plaintiff did not oppose his
23  application at the time he **filed** it on 2013 **March 19**, that was nonetheless a lie–by
24  omission.  Mr. Dermer omitted that there was no opposition because Plaintiff was
25  unaware of the *ex parte* application; notice was not given until **by mail** on 2013
26  **March 19** the same day of the *ex parte* application was filed.

27  As to **Snyder**, her reaction to the falsehoods and perjury by her Jewish
28  colleague?  She was okay with it.

PLAINTIFF'S MO TRANSFER TO NON-JEWISH JUDGE                    **Page 24**

# Concluding Statement

These above cases are the Scottsboro Boys revisited.

That is how it has gone.  The Jewish lawyers do not have to break a sweat, **Snyder** does all the heavy lifting for them; an undiluted display of racism.  Every. Single. Jew. that has come into contact with our cases has antisocial behavior, impressive disregard for the truth or the rules and laws the rest of us live by.

Finally, what pushed Plaintiff over the cliff in this case, in May of last year, **Snyder** made two, two racist statements against Plaintiff in front of the all-white jury and for effect, to impress the jury, smiled like Plaintiff's fairy godmother while uttering her foul words.  Plaintiff was born, baptized and confirmed a traditionalist Catholic and now returns to his roots.  Traditionalist Catholic doctrine holds Jews in a very dim light, believe quite strongly, see ante, that there should be no intermingling or contact.  The conduct of the Jews, even just the few detailed herein, fully support this.

Forcing Plaintiff to continue in Courtroom 5 would force Plaintiff to either go against traditionalist Catholic doctrine and beliefs that have been re-ignited in him by Every. Single. Jew. that has come in contact with this case or abandon this civil rights action seeking to vindicate civil liberties and rights.  Accordingly, this case should be transferred to a non-Jewish judge for all further proceedings consistent with the United States Supreme Court's decision, **Hobby Lobby**, *supra*.

Submitted —
2014 August 02


By:

B. Benedict Waters
**Plaintiff**, *Pro Se*

PLAINTIFF'S MO TRANSFER TO NON-JEWISH JUDGE                    **Page 25**

# Supporting Declaration

I, B. Benedict Waters, do declare:

I am the named Plaintiff herein, am over the age of majority, and am prosecuting this matter *pro se*.  If called as a witness I could and would competently testify to all of the following of my own percipient or personal knowledge:

1.      Declarant was born, baptized and confirmed a Roman Catholic long before Vatican II and attended Catholic schooling prior to Vatican II at which time the Catholic instruction and doctrine was that Jews had caused the evil in the world, were responsible for the death of Jesus Christ, did not believe in God or Heaven and contact with Jews must be avoided.  In other words, Declarant was raised and instructed under the pre-Vatican II doctrine.

2.      Vatican II issued a declaration addressing this doctrine but the declaration was not dogma and thus not binding on Roman Catholics.  The Roman Catholic church could have remedied this by issuing dogma but, as of this date, interestingly enough has not done so.

3.      For this and other reasons, there is a schism in the Catholic Church with traditionalist Catholics adhering to the faith of the traditional Catholic Church and the traditional religious beliefs regarding Jews.  The unlawful, unethical and dishonest conduct of the Jews in this and other cases, over a period of seven ( 7 ) years converted Declarant back to traditionalist Catholic doctrine and religious beliefs regarding Jews.

/ / /

I declare under penalty of perjury pursuant to the laws of the state of California that the foregoing is true and correct and that this declaration was executed at Los Angeles, California on 2014 August 02.

**B. Benedict Waters**

PLAINTIFF'S MO TRANSFER TO NON-JEWISH JUDGE                    **Page 26**

# PROOF OF SERVICE

I, Arlene Johnson, the undersigned, certify and declare that I am over the age of 18, employed in the County of Los Angeles, California, and not a party to the within cause.

On 2014 August 05, I served a true copy of:

### *Plaintiff's Notice and Motion For Transfer To Non-Jewish Judge On Religious Grounds*

---

by depositing it in the United States Mail, at Los Angeles, California, in a sealed envelope with the postage thereon fully prepaid addressed to the following:

Office of City Attorney
200 N. Main St., 9th Flr, City Hall East
Los Angeles, CA 90012

I hereby certify under the penalty of perjury that the foregoing is true and correct. Executed 2014 August 05, at Los Angeles, California.

Signature of Person Making Service